**DIGICOURSE, INC.**

v.

**AMA DISTRIBUTORS, INC., et al.**

Civ. A. No. 82–3433.

United States District Court, E.D. Louisiana.

May 21, 1984.
On Motion for Summary Judgment
Dec. 31, 1984.

Paul J. Hayes, Weingarten, Schurgin, Gagnebin & Hayes, Boston, Mass., for plaintiff.

James R. Uhlir, Christenson, O'Conner, Johnson & Kindness, Seattle, Wash., for defendants.

## MEMORANDUM OPINION

MENTZ, District Judge.

The Court issued a Memorandum Opinion on February 28, 1984, granting the motion of the defendants, New Orleans Novelty Company and Rowe International, Inc., to limit evidence at trial on the issue of infringement to only those accused devices that possess a view-restricting shield positioned between an observer and a display screen such that the observer is prohibited from viewing any portion of the display screen at a 90° angle. Soon thereafter, Digicourse (the plaintiff herein) moved for reconsideration. The Court allowed the parties to file additional memoranda and again heard extensive argument on the issue.[1] At the conclusion of the hearing, the Court re-affirmed its earlier ruling and promised to supply written reasons.[2] Having had additional time to reflect upon the issues and to review the material submitted by the parties, the Court still believes its original ruling is correct.

*Construction of the Patent Claims*

The construction of a patent claim is a legal question. Normally, there are underlying factual disputes which must be resolved before a court is able to extrapolate the meaning of the language of a patent claim. This is not always the case, however. Long ago, the Supreme Court recognized that there are some cases in which expert testimony is not needed to construe the meaning of a patent. *Winans v. The N.Y. and Erie R.R. Co.*, 62 U.S. (21 How.) 88, 16 L.Ed. 68 (1859). In *Winans*, the Court stated:

> [B]ut professors or mechanics cannot be received to prove to the court or jury what is the proper or legal construction of any instrument of writing.... Experience has shown that opposite opinions of persons professing to be experts, may be obtained to any amount; and it often occurs that not only many days, but even weeks are consumed in cross-examinations, to test the skill or knowledge of such witnesses and the correctness of their opinions, wasting the time and wearying the patience of both court and jury; and perplexing, instead of elucidating the questions involved in the issue.
>
> If the construction given by the court to the specification be correct, and in fact the only construction of which it is capable, as we think it is, it would be wholly superfluous to examine experts to teach the court, what they could clearly perceive without such information....

More recently, the Court of Claims held that a court should look to the patent and

---

1. At the hearing on the original motion, plaintiff only had local counsel present. After the Court heard argument on the original motion, it was informed that plaintiff's local counsel was not skilled in the patent law and that plaintiff desired to have its "patent" attorney argue the motion for reconsideration. This factor was influential in the Court's decision to hear additional argument.

2. After the hearing on the motion for reconsideration, the Court granted the plaintiff permission to file an additional memorandum of law. This memorandum was received by the Court on March 28, 1984. Attached to it were two affidavits. The Court has reviewed the memorandum of law but, however, has not considered the affidavits, which were not submitted timely.

its file wrapper in order to construe the meaning of terms used in a patent. *General Electric Co. v. United States,* 572 F.2d 745, 215 Ct.Cl. 636 (1978) (en banc). There, the court stated:

> Since the patentee is his own lexicographer, no genuine issue of fact as to the meaning of a claimed term can be found to exist where the meaning is made incontrovertibly clear elsewhere in the patent or in the file wrapper. *Duplan Corp. v. Deering Milliken, Inc.,* 370 F.Supp. 769, 772, 180 USPQ 373, 376 (D.S.C.1973), and cases cited therein.

*General Electric Co.,* 572 F.2d at 751. It is within this legal framework that the Court has examined the Digicourse patent.

The Court is firmly convinced that the Digicourse patent requires a device to be constructed in such a way that a view-limiting shield precludes a viewer from observing any portion of the display unit when looking at the display unit at a right angle. The Court has thoroughly reviewed the patent's claims, specifications, and file wrapper. Moreover, the Court has been enlightened by extensive briefs and argumentation. This exhaustive review leaves the Court with the inescapable conclusion that it has interpreted the scope of the Digicourse patent correctly. The clear language of the patent and its prosecution history mandate this result.

*The Function of the View-limiting Shield.*

■ The Digicourse patent has one independent claim, namely Claim 1. Claim 1, in pertinent part, states that the invention is:

> A self-illuminated readout having a glare and reflection control for ambient light comprising:
>
> ... (c) view-limiting shield means carried by said casing and positioned in the light path between the light emitting display and an observer so that

the viewing angle is restricted to less than 90° relative to the plane of said display unit thereby to eliminate reflections of external objects from the display unit.

The term "view-limiting shield means" is qualified by two restrictive clauses: (1) the "so that" clause and (2) the "thereby" clause. The "so that" clause establishes that it must be the view-limiting shield, not some other object, that prevents the observer from viewing the display screen at an angle of 90° or more. The "thereby" clause adds another requirement, which is generally satisfied whenever the first requirement is satisfied, but need not be. It states that the view-limiting shield must be positioned in such a way as not only to restrict the vision of the normal observer in the required way but also to eliminate reflection of external objects from the display unit. The first clause is the one that is significant to this motion. The language of subsection (c) requires that a causal nexus exist between the restriction placed on the observer's vision and the view-limiting shield. In other words, the specified restriction on the viewer's vision must be caused by the view-limiting shield. If this is not the case, then an accused device cannot be said to have infringed upon the Digicourse patent.[3]

This interpretation is supported by the language in the specifications. Referring to figure 10, the specification states, "The upper surface 14D of the depression defines a blocking shield to prohibit reading the light emitting information display 15D directly on or at an angle of 90° thereto." (*See* Digicourse patent, p. 2, line 67.) This language is reiterated elsewhere in the patent specification in reference to figures 1 through 9. (*See* Digicourse patent, p. 1, lines 66–68; p. 2, lines 18–24; p. 2, lines

---

**3.** An argument can be made that the "thereby" clause modifies the "so that" clause in the following way: that as a consequence of the view-limiting shield preventing the observer from viewing the display screen at an angle of 90° or more, reflections of external objects are automatically eliminated from the display screen. Interpreted in this manner, the "thereby" clause

would not establish an independent requirement that must also be met by the placement of the view-limiting shield. Still, however, the "so that" clause would require that the view-limiting shield restrict the observer's vision in the specified manner. Consequently, this distinction is irrelevant to the Court's analysis.

33–36; p. 2, lines 43–46; p. 2, lines 55–59.) The language clearly indicates that a function of the view-limiting shield is to prohibit an observer from viewing the display screen at an angle of 90° or more.

Likewise, the prosecution history is replete with references to the view-limiting shield. These references repeatedly demonstrate that one purpose of the view-limiting shield is to restrict the observer's vision in the specified manner. For example, in the inventor's initial application, ultimately rejected by the Patent Office, he claimed:

> 5. A controlled reflection readout for digital displays comprising a casement, a digital display unit ..., and glare shielding means extending forwardly of the casement at the top thereof so that digital readout cannot be viewed by a reader at 90° to the plane of the numerical digital display indication....

[See Defendant's Memorandum in Support of Motion in Limine on Issue of Infringement (hereinafter "Defendants' Memorandum"), Exhibit 2, p. 11.] The inventor subsequently filed a continuation-in-part (CIP) application. In the CIP application, the inventor included expert affidavits which attempted to meet the examiner's earlier objections, all of which were based upon considerations of obviousness to the prior art. Two of the experts attempted to distinguish the Digicourse patent from the prior art by specific references to the function of the view-limiting shield. Peter C. von Thuma stated:

> It is my opinion that the applicant's claims 9 and 10 are not directed to a device which would be obvious to one skilled in the art from the teaching of Heilmeier for the following reasons:
>
> ... (g) Applicant's device depends upon the use of light-emitting devices, control of the angle of view of the observer in the form of a view restricting shield[,] and a light absorbing surface on the inner side of the shield....

(See Defendants' Memorandum, Exhibit 6, pp. 22–23.) The other expert, Lawrence R. Brown, commented:

The claims define this significant difference [from Heilmeier] by defining [:] ... (4) shield structure limiting view to less than 90° to the plane of the display unit.... All these are distinctive limitations[:] ... (4) Heilmeier has no equivalent to the shield limiting the view—note the observers (sic) (22b) view is unobstructed to the viewing surface 57.

(See Defendants' Memorandum, Exhibit 6, p. 26.) These are but examples of numerous references to the function of the view-limiting shield contained in the prosecution history. Other examples were cited by this Court in its first opinion. Since remarks and arguments made during the patent prosecution can estop an applicant from claiming "equivalency," *Caterpillar Tractor Co. v. Berco*, 714 F.2d 1110 (Fed.Cir. 1983), it follows that these same remarks and arguments can be relied on when interpreting the meaning of terms used to describe the invention. Clearly, the remarks made during prosecution reinforce the Court's interpretation of Claim 1 that an observer's view of the display screen must be restricted to an angle of less than 90° by a view-limiting shield.

*"Viewing Angle"—A Term of Art?*

Digicourse maintains that the term "viewing angle" contained in Subsection (c) of Claim 1 is a term of art. Accordingly, it contends that the meaning of this term must be interpreted by one skilled in art. [See Plaintiff's Memorandum in Support of Motion for Reconsideration (hereinafter "Plaintiff's Memorandum"), Affidavit of James M. Lapeyre, Exhibit A, p. 1.] The Court finds this argument unconvincing for two reasons.

First, the Court notes that there can be no genuine issue as to the meaning of a claimed term when that meaning is made incontrovertibly clear in the patent or in the file wrapper. *General Electric Co. v. United States*, 572 F.2d at 751. Nowhere in the patent or file wrapper is there even the faintest suggestion that "viewing angle" has the specialized meaning now

ascribed to it by Digicourse. Moreover, when defined in the way suggested by Digicourse, "viewing angle" makes no sense in reference to most of the embodiments contained in the patent. *See* nt. 4, below.

Second, even if the term "viewing angle" does have a specialized meaning, the term, as defined by Digicourse, is not difficult to comprehend. Digicourse contends that "viewing angle" means the angle created by the display screen and the height of the observer.[4] (*See* Plaintiff's Memorandum, p. 5.) But when "viewing angle" is defined in this way, it becomes clear that it is the relationship between the position of the display screen and the height of the observer that restricts the observer's view to an angle of less than 90°.[5] This may produce the desired result of eliminating reflections to the observer, but it fails to do so in the manner specified by the patent. The patent teaches a method of eliminating reflections by the positioning of a view-limiting shield that prevents an observer from viewing the display screen at a right angle. When "viewing angle" is defined in the way that Digicourse suggests, the view-limiting shield is immaterial to the specified restriction on the observer's view. Thus, even when "viewing angle" is defined in this way, the requirement in Claim 1 that the view-limiting shield restrict the observer's vision is not met. When this requirement is not met, there can be no infringement on the Digicourse patent.

*The "Any Portion" Requirement*

Subsection (C) of Claim 1 specifies that the view-limiting shield must be positioned such that the viewing angle of an observer is restricted to less than 90° relative to the plane of this display unit. Hence, the question arises whether the patent encompasses the situation wherein the blocking shield prevents only a portion of, rather than the entire display screen from being viewed at a right angle. The Court interprets the patent to mean that no portion of the display screen can be visible to an observer attempting to view the screen at an angle of 90° or more.

The Court again relies upon the prosecution history of the Digicourse patent to arrive at its conclusion.[6] *General Electric Co. v. United States*, 572 F.2d at 571. The file wrapper indicates that the blocking shield must prevent the viewing of the entire display screen of the device. This is clear from remarks made during prosecution of the application and from a rejected and abandoned claim. During the initial

4. While this definition may be applicable to Figures 9 and 10 of the Digicourse patent, it makes little sense in connection with figures 1–8. Counsel for Digicourse admitted as much when in oral argument he stated that, in reference to figures 5 and 6 (the wrist watch), the blocking shield would have to be extended far enough to prevent the observer from viewing the display at 90°. (Transcript, p. 33.) The Court fails to understand why the term "viewing angle" should be given a specialized meaning in one situation (figures 9 and 10, the instrument console) and not in the others (figures 1–8.)

5. It is conceivable that, in addition to the view-limiting shield, other factors could also restrict an observer's vision. The patent, however, does not provide for "other factors" to act as a substitute for the view-limiting shield. Thus, at the very least, the view-limiting shield must block the observer's vision when viewing the display screen at a 90° angle.

6. Digicourse, relying on *Hughes Aircraft Co. v. U.S.*, 717 F.2d 1351, 219 U.S.P.Q. 473, 481 (Fed. Cir.1983) and *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 219 U.S.P.Q. 1137, 1141

(Fed.Cir.1983), argues that the Court is precluded from reviewing the file wrapper when deciding literal infringement. These cases, however, do not forbid a court from examining the prosecution history to discern the meaning of a claim. Indeed, numerous courts have recognized the propriety of reviewing the file wrapper in order to construe a claim. For example, the Court in *Carborundum Co. v. Combustion Engineering, Inc.*, 505 F.Supp. 1011, 1018 (D.Del. 1981) stated:

The doctrine of file wrapper estoppel is more than a mere defense; it is a basic tenet of claim construction.... Thus, the file wrapper may limit the meaning of the claim language whether [plaintiff] is asserting literal infringement or infringement under the doctrine of equivalents.

*Accord: General Instrument Corp. v. Hughes Aircraft Co.*, 399 F.2d 373 (1st Cir.1968); *General Electric Co. v. United States*, 572 F.2d 745, 215 Ct.Cl. 636 (1978) (en banc); *Duplan Corp. v. Deering Milliken, Inc.*, 370 F.Supp. 769 (D.S.C. 1973).

application, the inventor was attempting to overcome patent office objections that his invention was obvious over Shreve in view of Wirth. The applicant responded to the patent office's objections by stating:

Applicant eliminates reflections on the surface of the window so that visibility through the window is enhanced. Shreve permits the viewer to [view] the lower portion of the display case window at right angles, Lapeyre deliberately prohibits viewing through the window at right angles and still renders the entire display visible.

(*See* Defendants' Memorandum, Exhibit 2, p. 24.) Moreover, during the prosecution of the CIP application, the inventor deliberately attempted to expand the scope of his invention to include a device wherein the view-limiting shield prevented "at least a portion of said display from being viewed at an angle of 90°." (*See* Defendants' Memorandum, Exhibit 6, pp. 11–12, 39–40.) This claim, Claim 3, was included in an amended CIP application along with another claim, Claim 1. Claim 1, when read in light of Claim 3, was narrower. It provided that the view-limiting shield must restrict the observer's vision of the plane of the display screen to an angle of less than 90°. With some modifications not relevant to the discussion here, Claim 1 was ultimately approved by the Patent Office. Claim 3, on the other hand, was rejected as being obvious over Hosokawa taken alone or considered with Bergey. (*See* Defendants' Memorandum, Exhibit 6, pp. 39–51.) The applicant subsequently abandoned Claim 3. Claim 3 explicitly included the situation wherein a portion of the screen was observable at a 90° angle; Claim 1 did not. Thus, the Court believes that Digicourse cannot now assert that Claim 1 encompasses the situation described in Claim 3.

Additionally, this interpretation is supported by a technical brochure issued by Digicourse to potential licensees. (Lapeyre Depositions, Exhibit 4.) The brochure contains instructions on how to structure a controlled reflection readout within the ambit of the patent. (Lapeyre Depositions,

Exhibit 4, p. 6) (Attached hereto as Appendix A.) In the drawings on page 6, line CD represents the height of a display screen drawn to scale. Line Cz is drawn perpendicular or at a right angle to line CD at point C. Point C represents the lower edge of the display screen. The view-limiting shield is represented by line BG. Point B, the forward edge of the view-limiting shield, is located on line Cz. Thus, according to the teachings of the Digicourse brochure, an observer is always precluded from viewing any portion of the display screen at an angle of 90° or more.

Accordingly, the Court believes that Claim 1 can only be interpreted so as to require that no portion of a device's display screen is visible to an observer viewing the screen at an angle of 90° or more due to the placement of a view-limiting shield.

*Conclusion*

Counsel for Digicourse stated that the patent was inartfully drafted. (Transcript, p. 35) To the extent that the Digicourse patent was meant to describe the ideas that Digicourse now claims are the essence of the invention, counsel is correct: the patent was inartfully drafted. Unfortunately, however, this is a defect which the Court is not at liberty to correct. The law requires that the claims of a patent must be directed to the subject matter which the applicant regards as his invention. It also requires that the claims define the patent with particularity and distinction. 35 U.S.C. § 112. Subsection (c) of Claim 1 requires that the view-limiting shield must be positioned between the display screen and an observer so as to prevent an observer from viewing any portion of the display screen at an angle of 90° or more. This requirement must be met for there to be literal infringement of the Digicourse patent.

All the parties have entered into the following stipulation:

"It is hereby stipulated that in all 31 of the accused games, the view-limiting shield does not prevent viewing a portion of the display at a 90° angle."

Because the patent requires that the view-limiting shield must restrict an observer's view in the above-mentioned way, the Court will not allow any evidence to be introduced at trial on the issue of literal infringement.

The Court is mindful that the practical effect of granting defendant's motion is similar in result to that of a motion for partial summary judgment. There are some important differences, however. Here, the Court simply made a legal determination on what is a legal question: the construction of a patent claim. This was done after an exhaustive review of a well-developed record. The parties, themselves, then stipulated to the facts that are disposi-

tive of the infringement issue. But even if defendant's motion is considered as a motion for summary judgment, the Court believes that such a motion is appropriate where the Court can understand the relevant technology without the aid of expert opinion, and where factual presentation is not necessary to elucidate the patent. *Arshal v. United States*, 621 F.2d 421, 223 Ct.Cl. 179 (1980); *Black Sivalls & Bryson, Inc. v. National Tank Co.*, 445 F.2d 922 (10th Cir.1971). This is the case here. Indeed, the inventor, himself, has attested to the simplicity of the invention. (Lapeyre Deposition, May 4, 1983, p. 157). Accordingly, the Court's prior ruling will be upheld.[7]

APPENDIX A

## GRAPHIC SOLUTIONS TO CONFIGURATIONS

When the height of the shield is given.

1. Draw $xy$ at approximate angle of display panel.
2. Lay out display height $CD$ to scale and locate midpoint $A$.
3. Erect line $Cz$ perpendicular to $xy$.
4. Locate $B$ at given shield height from $C$.
5. Draw shield $BG$. (The distance $DG$, the angle $BGD$ and the shape of the shield have no effect on CRR operation.)
6. Draw $DE$ through $B$. $E$ is located at the minimum upper viewing distance.*
7. Draw $CE$ and $AE$. $CAE$ is the maximum upper viewing angle.
8. $F$ represents the lowest viewing point. Angle $CAF$ rarely should be less than 30° and preferably on the order of 45°.
9. Angle $EAF$ is the usable viewing sector.
10. The complete configuration may be rotated on point $A$ to adjust the viewing sector up or down. CRR also can be inverted so that the shield projects under the display and $E$ becomes the lower viewing point.

When the maximum upper viewing angle is given

1. Draw $xy$ at approximate angle of display panel.
2. Lay out display height $CD$ to scale and locate midpoint $A$.
3. Erect line $Cz$ perpendicular to $xy$.
4. Lay out the required upper viewing angle $CAE$ with $E$ located at the minimum upper viewing distance.*

---

**7.** The Court is not authorized by Fed.R.Civ.P. 56 to *sua sponte* enter summary judgment. *Capital Films Corp. v. Charles Fries Production,* 628 F.2d 387 (5th Cir.1980); *Sharlitt v. Gorinstein,* 535 F.2d 282 (5th Cir.1976). However, the Court will now entertain a motion for partial summary judgment on the issue of literal infringement.

5. Draw $CE$ and $DE$. Locate shield edge $B$ at intersection of $C$ and $DE$.

6. Draw shield $BG$ (Angle $BGD$, distance $DG$ and shape of shield have no effect on CRR operation.)

7. $F$ represents the lowest viewing point. Angle $CAF$ rarely should be less than 30° and preferably on the order of 45°.

8. Angle $EAF$ is the usable viewing sector.

9. The complete configuration may be rotated on point $A$ to adjust the viewing sector up or down. CRR also can be inverted so that the shield is under the display and $E$ becomes the lower viewing point.

*Viewing distances beyond 40 times the display height have an insignificant effect on the configuration.

## ON MOTIONS FOR SUMMARY JUDGMENT

The defendants herein have brought motions seeking summary judgment on the infringement issue with respect to all thirty-one of the contested video games. The Court heard oral argument on these motions on October 31, 1984, and took the matter under submission at that time.

The Court is not going to rehash what has already been stated in earlier opinions and minute entries. The prior record is clear. Instead, we intend to rule on the literal and equivalent infringement issues by placing much reliance on what was said in the earlier opinions.

### Literal Infringement

The Court has already stated what it believes to be the proper construction of the Digicourse patent. (See May 21, 1984 Memorandum Opinion). Thereafter, on June 5, 1984, we issued a minute entry which went to the heart of the literal infringement issue.[1] The parties were required to state whether the following statement was true or false with respect to each of the thirty one games:

At every right angle from the display screen (i.e., light emitting display), an observer positioned outside of or above the view-limiting shield (e.g., from the position of the so-called "eight-foot giant") is prevented from viewing any portion, however small, of the display screen by the view-limiting shield.

An answer of "true" would mean that the game in question did infringe on the Digicourse patent. A "false" answer would indicate that there was no literal infringement. The parties agree that the above statement is false with respect to twenty-seven of the contested games.[2] Accordingly, these twenty-seven games do not literally infringe upon Digicourse's patent.

No agreement was reached with respect to four games. The Court appointed a special master who was charged with conducting an independent investigation to determine whether the above statement was true or false with respect to each of the remaining games. All parties agree that three of the four games (Quasar, Piranha, and Pepper II) actually inspected by the special master do not infringe. Digicourse, however, maintains that the games inspected by the special master are not duplicates of the games actually put in commerce by the defendants. Moreover, Digicourse claims that its agents inspected each of these three games in 1982. Based upon the drawings and pictures taken by

1. Prior to the May 21, 1984, Memorandum Opinion, the parties had entered into a stipulation which we thought was dispositive of the literal infringement issue. Digicourse informed us, however, that we had misconstrued the intended import of the stipulation. Rather than relying on the contested stipulation, we issued the June 5, 1984, Minute Entry.

2. The twenty-seven games in this group are Pac Man, Ms. Pac Man, Galaxian, Galaxia, Galaga, Blueprint, Lazarian, Ms. Pac Man (mini), Wizard of Wor, Solar Fox, Satans Hollow, Tron, Jungler, Turtles, Super Cobra, Astro Invaders, Scramble, Strategy, Frogger, Astro Blaster, Donkey Kong, Donkey Kong Jr., Popeye, Xevious, Route 16, Dambusters, and Monte Carlo.

the agents at that time, Digicourse has offered affidavit testimony that the view-limiting shield would prevent an observer from viewing any portion of the display screen in each of the three games as they existed in 1982. (See Record Document 270a, Exhibits A, K, and L.) When a disputed question of fact exists on a summary judgment motion, as is the case here, all factual inferences must be resolved in favor of the non-movant. *Casey Enterprises, Inc. v. American Hardware Mutual Insurance Co.*, 655 F.2d 598, 602 (5th Cir. 1981); C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2727 (2d Ed.1983). Thus, summary judgment is inappropriate, and Digicourse will be allowed to present its case on literal infringement with respect to the Quasar, Piranha, and Pepper II games.

■ The fourth game inspected by the special master was Robby Roto. The special master concluded that an observer could view the bottom 2½ inches of the CRT tube from a position outside of or above the view-limiting shield. Digicourse makes two objections to the special master's findings. First, they argue that the term "CRT tube" is not synonymous with the term "light emitting display" used in claim 1(c) of the patent. Digicourse claims that the light emitting display refers to the portion of the CRT tube that is lit after a program is inserted into the game. Because there was no program in the Robby Roto game inspected by the special master, Digicourse contends that the special master could not make a proper determination. There may be some merit to Digicourse's argument. The patent was designed to eliminate the reflection of unwanted glare from the display unit. Claim 1(c) speaks of a view-limiting shield being positioned between the observer and a *light-emitting display*. Thus, when the patent is interpreted in the way most favorable to Digicourse, as must be done on a summary

judgment motion, *id.*, the display unit would consist of only that portion of the display screen that is lit after a program is inserted into the game.

Secondly, Digicourse challenges the Robby Roto determination because the special master took measurements from the curved surface of the CRT tube and not from the plane of the display. Claim 1(c) clearly states that "the viewing must be restricted to less than 90° *relative to the plane of said display*". Digicourse has introduced affidavit evidence indicating that the plane of the display is that plane which is tangent to the center of the display (in this case, the plane that is tangent to the center of the CRT tube). (Record Document 270a, Exhibit N.) Evidence also exists that when measurements are taken relative to the plane of the display, no portion of the Robby Roto display can be seen at any right angle to the display. (Record Document No. 270a, Exhibit N.) Thus, the partial summary judgment with respect to the Robby Roto game is inappropriate.

*Equivalent Infringement*

■ The equivalency issue has been addressed once before by this Court. In our earlier opinion, we concluded that the prosecution history estoppel doctrine precluded Digicourse from asserting that its patent covered any device wherein the view-limiting shield prevented an observer from viewing any less than the whole light-emitting display. (See February 28, 1984, Memorandum Opinion.) This holding was based on the fact that Digicourse had given up this claim during the prosecution of its patent.[3] Nothing in the most recent briefs of the parties dissuades us from our earlier view. If anything, our belief has been reinforced because it has become obvious that the Digicourse patent was introduced into a crowded field. Thus, its claims must be construed narrowly. *Rubinstein v. Silex Co.*, 73 F.Supp. 336 (S.D.N.Y.1947).

---

**3.** As the court stated in *Hughes Aircraft Co. v. U.S.,*:

The doctrine of prosecution history estoppel precludes a patent owner from obtaining a

claim construction that would resurrect subject matter surrendered during the prosecution of his patent application.

717 F.2d 1351, 1362 (Fed.Cir.1983).

Accordingly, the Court believes that partial summary judgment on the issue of equivalent infringment with respect to all thirty-one games is warranted.[4]

CONCLUSION

The defendants' motion for partial summary judgment on the issue of literal infringement is GRANTED in part and DENIED in part. It is GRANTED with respect to the twenty-seven games relative to which the parties have entered into stipulations based on the Court's June 5, 1984, Minute Entry.[5] It is DENIED with respect to the four games relative to which the parties have failed to enter into stipulations.[6] Furthermore, the defendants' motion for partial summary judgment on the equivalent infringement issue is GRANTED with respect to all thirty-one games.

---

4. For a complete discussion of this issue, see the Court's February 28, 1984, Memorandum Opinion.

5. For a complete list of these games, see *supra* note 2.

6. These four games include Pepper II, Piranha, Quasar and Robby Roto.