**CAPITAL FILMS CORPORATION et al.,**
**Plaintiffs–Appellants,**

v.

**CHARLES FRIES PRODUCTIONS, INC.**
**and American Broadcasting Company,**
**Defendants–Appellees.**

No. 78–3563.

United States Court of Appeals,
Fifth Circuit.

Oct. 15, 1980.

Sandy M. Sandoloski, Lawrence E. Ackels, Sr., Lawrence E. Ackels, Jr., Michael W. McManus, Dallas, Tex., for plaintiffs–appellants.

Jenkins & Gilchrist, William D. Sims, Jr., Dallas, Tex., for Charles Fries Productions, Inc. and American Broadcasting Co.

Before GOLDBERG, GARZA and REAVLEY, Circuit Judges.

GARZA, Circuit Judge:

## I

In 1962 Falcon International Corporation (Falcon) organized for the purpose of producing and distributing motion picture films. In 1964, following the assassination of President Kennedy, Falcon produced a film entitled "The Trial of Lee Harvey Oswald" based upon the legal proceedings which might have occurred had Oswald not been murdered. The film was publicized in cities throughout the nation and advertised in the entertainment sections of several large newspapers including the New York Times and Daily Variety. The world premiere was held on April 22, 1964 at Milwaukee, Wisconsin where some 6,000 persons viewed the film. In the following weeks several thousand others viewed the film. The film was not a commercial success and was indefinitely withdrawn from distribution.

In April, 1976, in the midst of a renewed public interest in the assassination, Falcon learned that Charles Fries Productions (Appellee–Fries), a movie production company, and the American Broadcasting Company (Appellee–ABC) planned on producing and televising a movie by the title of "The Trial of Lee Harvey Oswald". Although the Fries–ABC film presented its story in a somewhat different format than the Falcon film, it basically depicted the murder trial of Lee Harvey Oswald. Falcon contacted ABC and informed it that Falcon had produced a similar movie in 1964, bearing the same exact title and that Falcon intended to re–release the film.

A short time later, Falcon sold the film to Capital Films (Appellant–Capital). Capital undertook to distribute the movie and engaged several test showings of the film. After it became clear that ABC planned on televising its version bearing the same title, Capital filed suit for injunctive relief which was denied. The Fries–ABC film was televised in two parts in September and October of 1977.

## II

Capital filed this action in Texas state district court. On July 21, 1977, the case was removed to the United States District Court under 28 U.S.C. § 1441 on the basis of diversity of citizenship under 28 U.S.C. § 1332.

Capital's initial complaint alleged unfair competition in that the title and concepts had been plagarized from its film. On August 26, 1977, Appellees filed their motion for summary judgment in response to the claim of unfair competition. On September 14, 1977, Capital filed its motion and other material in opposition. On September 20–21, 1977, a hearing on the preliminary injunction was held and, as previously mentioned, the request was denied.

On September 5, 1978, after Appellees had filed their motion for summary judgment, Capital filed its second amended complaint which added interference with contractual business relations, misappropriation and implied contract causes of action and alleged additional facts from which these causes of action allegedly arose. The case was carried on the jury docket and set for trial Monday, October 16, 1978. On the Thursday prior to the trial setting, October 12, 1978, a joint pre–trial order was entered defining the issues and scope of the trial. On the next day, Friday the 13th, 1978, without notice to Capital, the District Court granted Appellee's motion for summary judgment.

In a memorandum opinion, the District Court set out what it considered to be the two essential issues of fact of unfair competition which Capital must have created in order to withstand summary judgment. The Court held that (1) the title "The Trial of Lee Harvey Oswald" of the 1964 Falcon film must have acquired a secondary meaning and (2) that the use of the same title in the Fries–ABC movie had the likelihood of confusing the public such that it would watch the Fries–ABC movie believing it to be the 1964 movie. Regarding the first issue, the Court found that Capital has produced sufficient evidence to create a genuine issue of fact of whether the 1964 Falcon film had acquired a secondary meaning. Our review of Capital's summary judgment proof in opposition leads us to the same conclusion.

Regarding the "likelihood of confusion" issue, the Court found that Capital had failed to create a genuine issue of fact as to the likelihood of confusion in the public mind concerning the source of the Fries–ABC movie. Relying exclusively on *Kirkland v. National Broadcasting Co. Inc.*, 425 F.Supp. 1111 (E.D.Pa.1976), *aff'd* 565 F.2d 152 (3rd Cir. 1977), the Court reasoned that any public confusion would only be "momentary" since a television viewer familiar with and expecting to see the 1964 Falcon movie would quickly realize that the two movies by the same title were not the same. The Court found that a reasonable jury could not "conclude that ABC intended to pass off its movie as Capital's movie". This holding and its underlying legal principles will be discussed below in part IV of this opinion.

The Court also addressed and dismissed Capital's cause of action for interference with advantageous business relations reasoning that such a cause of action was dependent upon success of the unfair competition claim.

In a supplemental order of October 18, 1978, the District Court addressed Capital's misappropriation claim against appellees. Citing *Official Airlines Schedule Information Service, Inc. v. Eastern Air Lines, Inc.*, 333 F.2d 672 (5th Cir. 1964), and by applying the three essential elements for a misappropriation claim, the Court concluded that Capital had failed to establish an issue of fact as to any one of the elements.

## III

On appeal, Capital first complains of the propriety of the District Court granting summary judgment. Capital first contends that the procedure under which summary judgment was rendered against it was deficient in that Capital was never given the 10–day notice and hearing required by Rule 56 of the Federal Rules of Civil Procedure.

Secondly, Capital contends that its causes of action for interference with contractual business relations, misappropriation and implied contract were not before the District Court for summary judgment purposes, since these three causes of action and the facts under which they arose were pled *after* Appellee's motion for summary judgment was filed. Lastly, Capital contends that since neither the memorandum opinion or supplemental order deals with its implied contract claim, at least, it stands untouched and should proceed to trial.

### A

■ We first address Capital's complaint of the District Court's grant of summary judgment adverse to Capital's added causes of action absent a motion for summary judgment by either Capital or Appellees concerning those causes of action. The issue for determination is whether a District Court may *sua sponte* grant a motion for summary judgment. Rule 56 does not specify whether a Court can enter summary judgment on its own, in the absence of any request to do so. However, various Circuit Courts have recently addressed the issue and have reached different conclusions.

One line of cases has taken the moderate approach suggested by some authorities. "So long as the Court is careful to assure that the party against whom the judgment will be entered has sufficient advance notice and an adequate opportunity to demonstrate why summary judgment should not be granted, it is not inappropriate for the Court to act on its own." *See Kistner v. Califano*, 579 F.2d 1004 (6th Cir. 1978); *FLLI Moretti Cereali S. P. A. v. Continental Grain Company*, 563 F.2d 563 (2nd Cir. 1977); 10 Wright & Miller, Fed.Practice & Procedure: Civil § 2719 at 454 (1973).

The other trend takes more of a strict construction approach to the procedural safeguards of Rule 56. The first circuit to squarely face the issue was the Eighth Circuit in *Twin City Federal Savings & Loan Association v. Transamerica Insurance Company*, 491 F.2d 1122 (8th Cir. 1974). The Court reasoned that Rule 56 contem-

plates that the *parties* move for summary judgment with a definite requirement of service of the motion, opportunity for presentation of opposition material, and a hearing on the motion. Taking a "strict compliance" approach, the Court concluded that "although a district court may assist through pretrial proceedings in sharpening the issues, a court may not pose the issue and then proceed to decide the same without a motion for summary judgment." 491 F.2d at 1126. Another circuit court has followed this reasoning and held that the express language of paragraphs (a) and (b) of Rule 56 discloses that a motion for summary judgment is to be made by a party and that a district court is not authorized by Rule 56 to *sua sponte* enter summary judgment. *Choudhry v. Jenkins*, 559 F.2d 1085 (7th Cir. 1977). *See also* 6 Moore's Fed.Prac. ¶ 56.10 and ¶ 56.12 (2nd ed. 1976) at 174 and 338–339.

While both trends are based on sound policy considerations and each trend has certain advantages, this Court has also addressed and decided the issue. In *Sharlitt v. Gorinstein*, 535 F.2d 282 (5th Cir. 1976), the defendants filed a motion for summary judgment on the plaintiff's claim. The motion did not purport to cover the defendant's counterclaim. The district court granted defendant's motion for summary judgment. A month later, feeling that the same issues had been resolved in favor of defendants, the district court *sua sponte* entered judgment for the defendants on the counterclaim. This court vacated the judgment.

"On appeal, Sharlitt [plaintiff], complains that the court's sua sponte ruling denied him an opportunity to defend against defendant's counterclaim in violation of Fed.R.Civ.P. 56. We agree that the correct procedure was not followed. Rule 56 clearly requires that the party opposing summary judgment be given notice of a motion for that relief and be allowed 10 days within which to submit affidavits. *This court has interpreted the terms of Rule 56 strictly by refusing to dispense with procedural safeguards* in

instances where a motion to dismiss is treated as a motion for summary judgment by the district court. (citations omitted) A fortiori we will not countenance the final termination of a party's defense to an asserted claim by judgment on the claim entered *without a motion for summary relief* and the rule–required notice and opportunity to develop any defense." 535 F.2d at 283.

This Circuit's view of Rule 56 [1] and prohibition of *sua sponte* entry of summary judgment require us to vacate the district court's judgment insofar as it deals with Capital's causes of action for interference with contractual business relations, misappropriation, and implied contract.

### B

Capital also complains that the 10 day notice and hearing requirements of Rule 56 were not observed by the district court. Although the judgment regarding the three causes of action discussed in the preceding subsection must be vacated for failure to observe the motion requirement of Rule 56, even in the circuits following the moderate trend regarding Rule 56, where a district court is allowed *sua sponte* to enter summary judgment, it has been required that the court observe the same 10 day notice and hearing requirements applied to summary judgment motions filed by a party. *Herzog & Straus v. GRT Corporation*, 553 F.2d 789 (2nd Cir. 1977).

In addition to the above-mentioned causes of action, Capital argues that the 10 day notice and hearing requirements were not properly observed regarding its unfair competition cause of action. Specifically, Capital admits that a motion for summary judgment was filed over a year prior to entry of judgment but Capital argues that subsequent events and actions by the dis-

trict court induced it to believe the case was going to trial. Capital points to the fact that the case had been carried on the jury trial docket for several months and that a pre–trial order in contemplation had been filed by the court only the day before the court entered judgment. In addition, Capital points to the statement at the conclusion on the hearing for a preliminary injunction at which time the district court said, "On the Motion for Summary Judgment, I'm not ruling on that. I'm just ruling on this injunction matter at this time, everyone understand that?" The issue for determination is whether the appellees' filing and service of their motions for summary judgment and passage of over a year satisfied the notice and hearing requirements of Rule 56.

Rule 56(c) provides: "The motion shall be served at least 10 days before the time fixed for hearing . . . " *Enochs v. Sisson*, 301 F.2d 125 (5th Cir. 1962), concerned a case wherein plaintiff filed a motion for summary judgment, it was served on the defendant, no time was ever set for a hearing on the motion, and several months later the district court granted summary judgment in favor of the plaintiff. In reversing the district court, this court reasoned:

"No time was ever fixed for the hearing of this motion, and it is undisputed that the trial court did not have any rule fixing such time. See Rule 78, F.R.Civ.P. We do not think the order entered by the court below, in the absence of notice to the appellant [defendant] of the time fixed for the hearing, was within its jurisdiction under the quoted portion of Rule 56." 301 F.2d at 126.

Capital compares its situation with the plaintiff in *Kibort v. Hampton*, 538 F.2d 90 (5th Cir. 1976) wherein plaintiff filed his complaint July 22, 1975, defendants filed a

---

1. This circuit has held that oral motions for summary judgment are inconsistent with the procedural safeguards of Rule 56 and therefore are not authorized. *Hanson v. Polk County Land, Inc.*, 608 F.2d 129 (5th Cir. 1979). It is a well established rule in this circuit that a motion to dismiss, under Rule 12(b), when treated as a motion for summary judgment, must also abide by the procedural safeguards of Rule 56. *Hickey v. Arkla Industries, Inc.*, 615 F.2d 239 (5th Cir. 1980); *Underwood v. Hunter*, 604 F.2d 367 (5th Cir. 1979); *Georgia Southern and Florida Railway Company v. Atlantic Coast Line Railway Company*, 373 F.2d 493 (5th Cir. 1967), *cert. denied*, 389 U.S. 851, 88 S.Ct. 69, 19 L.Ed.2d 120 (1967).

motion for summary judgment on September 22, 1975, no hearing was noticed or requested in the motion, and the district court granted the motion on October 14, 1975 without any further communication of record between the parties and the court. In reversing the district court, this court stated:

> . . . As indicated by the *Bon Air* decision [*Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858 (5th Cir. 1970)], though, "hearing" does not necessarily mean an oral hearing. *What the rule contemplates is 10 day advance notice to the adverse party that the matter will be heard and taken under advisement as of a certain day* . . .
>
> Here the plaintiff received neither notice nor a hearing. *There was no reason for the plaintiff to suspect that the court was about to rule on the motion. If plaintiff had been given notice (by the defendants or the court), he may have submitted additional materials or moved for an extension of time to develop such materials through discovery.* 538 F.2d at 91.

We do not find any significant distinction between this case and the *Enochs* and *Kilbort* cases. At no time in the proceedings was Capital given notice that, as of a certain date, the district court would take the case under advisement. Consequently, Capital has been deprived of the safeguards guaranteed by Rule 56. Appellee argues that the Local Rules for the Northern District of Texas, particularly Rule 5.1(f), modify the notice and hearing requirements of Rule 56. We find nothing in the Local Rules which is inconsistent with Rule 56 or our holding in this case.

## C

Lastly, Capital complains that the summary judgment did not even address the implied contract theory, as pled in the alternative to misappropriation, within the second Cause of Action in Capital's Second Amended Complaint. Capital alleges that Falcon, in the process of seeking a distributor for its film, screened the film for agents and representatives of appellees on the implied understanding that they would not utilize the title, concept or ideas contained in the film.

Upon reading the Supplemental Order it is clear that the district court did not address the implied contract theory but instead dealt solely with the misappropriation theory. Perhaps the omission is due to the unclear statement of the cause of action as an alternative theory to misappropriation. Because the summary judgment is vacated on other grounds it is not necessary for us to deal with this issue except to suggest clarification through amended pleadings on behalf of Capital.

## IV

We have held that a remand has become necessary for procedural reasons and now turn to the issues of substantive law which should govern the case. As noted earlier, the District Court correctly held that a genuine issue of material fact existed concerning "secondary meaning". However, regarding the other element of unfair competition, the Court found that it would be impossible for a "jury to conclude that ABC intended to pass off its movie as plaintiff's movie" and, therefore, concluded there was no fact issue concerning "likelihood of confusion." Capital contends that the Court erred on the confusion issue by applying an inaccurate standard of law.[2] Capital contends that the law of unfair competition does not require that Capital show the public would be confused into believing that ABC televised the 1964 Falcon film. Instead, Capital argues that it is sufficient to show that the subsequent use by Fries—ABC of the identical title confused the public as to the source of the 1964 Falcon

**2.** The District Court also held that "likelihood of confusion" is a separate element of unfair competition to be proven from scratch. Capital argues that "likelihood of confusion" is an inevitable result of "secondary meaning" in cases of identical movie titles. However, application of the doctrine of Reverse Confusion to this case makes it unnecessary for us to address this issue.

movie. Capital relies on the landmark case of *Big O Tire Dealers, Inc. v. Goodyear Tire and Rubber Co.*, 408 F.Supp. 1219, 189 U.S. P.Q. 17 (D.Colo.1976), *modified on other grounds*, 561 F.2d 1365, 195 U.S.P.Q. 417 (10th Cir. 1977), *cert. dismissed*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). The *Big O* case concerned a relatively small tire company (Big O Tire Dealers, Inc.) which introduced two lines of tires as "Big O Big Foot 60" and "Big O Big Foot 70" in the Fall of 1973. Almost a year later, Goodyear decided to use the term "Bigfoot" in a nationwide advertising campaign to promote the sale of its new polysteel radial tire. Big O Tire Dealers brought suit against Goodyear for unfair competition. The District Court charged the jury that likelihood of confusion occurs when a later user uses a tradename in a manner which is likely to cause confusion among ordinarily prudent purchasers or prospective purchasers as to the source of a product. The effect of this instruction was to permit the jury to base liability on any kind of public confusion. Big O did not claim or present any evidence showing that Goodyear intended to trade on or palm off Goodyear products as being those of Big O. Instead, Big O contended Goodyear's use of Big O's trademark created a likelihood of confusion concerning the source of Big O's "Big Foot" tires. 561 F.2d at 1371. Goodyear argued that liability could not be imposed without a showing that Goodyear intended to trade on the goodwill of Big O or to palm off Goodyear products as being those of Big O. 561 F.2d at 1372. The Tenth Circuit posed the issue quite well:

> The facts of this case are different from the usual trademark infringement case. As the trial judge stated, the usual trademark infringement case involves a claim by a plaintiff with a substantial investment in a well established trademark. The plaintiff would seek recovery for the loss of income resulting from a second user attempting to trade on the goodwill associated with that established mark by suggesting to the consuming public that his product comes from the same origin as the plaintiff's product. The instant case, however, involves reverse confusion wherein the infringer's use of plaintiff's mark results in confusion as to the origin of plaintiff's product. 561 F.2d at 1371.

In affirming the District Court, the Tenth Circuit adopted the rationale and language of Judge Matsch's response to Goodyear's argument:

> The logical consequence of accepting Goodyear's position would be the immunization from unfair competition liability of a company with a well established trade name and with the economic power to advertise extensively for a product name taken from a competitor. If the law is to limit recovery to passing off, anyone with adequate size and resources can adopt any trademark and develop a new meaning for that trademark as identification of the second user's products. The activities of Goodyear in this case are unquestionably unfair competition through an improper use of a trademark and that must be actionable. 408 F.Supp. at 1236.

■ Judge Matsch's instructions and charge and the *Big O* decision have been lauded as a leading authority in the area of unfair competition and already serve as the basis for some of the jury instructions on trademark infringement and unfair competition in *Model Jury Instructions for Business Tort Litigation* published by the Section of Litigation of the American Bar Association.[3] *See* § 4.08–4.12. Reverse Confusion has now become a recognized doctrine within the scope of unfair competition, and we see no reason why it should not be applied in this case unless the law of

---

**3.** § 4.11 of the *Model Jury Instructions* does not recite Judge Matsch's charge on "likelihood of confusion" in total, but instead consists of a mixture of the traditional standard and Reverse Confusion. For a Reverse Confusion charge, as applicable to this case, refer to the appendix of Judge Matsch's opinion.

Texas–the forum of this case–would prevent its application.[4]

In *Big O*, the Tenth Circuit looked to the policy of the Courts of Colorado and found that the Colorado Supreme Court "has consistently recognized and followed a policy of protecting established trade names and preventing public confusion and the tendency has been to widen the scope of that protection." 561 F.2d at 1372 *citing Wood v. Wood's Homes, Inc.*, 33 Colo.App. 285, 519 P.2d 1212. Our review of Texas cases reveals that unfair competition has been held actionable in a wide spectrum and, although none have involved movie titles, many cases have recognized the applicability of unfair competition regarding similar trade names. *See Hanover Mfg. Co., Inc. v. Ed Hanover Trailers, Inc.*, 434 S.W.2d 109 (Tex.1968). Among these similar trade name cases, the Texas Courts have never emphasized "likelihood of confusion", but instead have generally afforded protection to business enterprises where the business, goods or services have acquired a "secondary meaning." In *Burge v. Dallas Retail Merchants Ass'n*, 257 S.W.2d 733 (Tex.Civ.App.–Dallas 1953, no writ history), the Court held that, where "secondary meaning" is established, "no other person may use the name or similar combination of words without clearly indicating that his business, goods, or services are not the same as those with which such terms have become associated." 257 S.W.2d at 735. The *Burge* case expresses an attitude of expansion of unfair competition protection in reciting the well known maxim "No wrong shall be without a remedy." 257 S.W.2d at 736. Indeed, the Court expressly adopted the rule stated in 148 A.L.R. 56 which we believe is a subtle precurser of the doctrine of Reverse Confusion.

"*The doctrine* [of unfair competition] *is applicable not only whereby the acts of the infringer customers are mislead to believe that the infringer's goods, services or business are the complaining party's, but also where the impression is created that the complaining party has sponsored, or approved or is in any way connected with the activities of the infringer*, or that the latter is affiliated with, or a part or a branch and subsidiary of the former." 257 S.W.2d at 736.

We, therefore, conclude that nothing in the jurisprudence of Texas prohibits the application of the doctrine of Reverse Confusion and upon remand of this case, the District Court should apply it in this case.

V

■■ The last issue remaining concerns the District Court's Supplemental Order dealing with Capital's alternative cause of action for misappropriation of an idea. Relying on *Official Airlines Schedule Information Service, Inc. v. Eastern Air Lines, Inc.*, 333 F.2d 672 (5th Cir. 1964), the District Court noted the three elements of misappropriation: (1) the idea is novel; (2) the disclosure of the idea was made in confidence; and (3) the idea was adopted and made use of by the defendant. The Court then concluded, as a matter of law, that the title, "The Trial of Lee Harvey Oswald", did "not constitute a sufficiently novel idea to deserve protection as a property right." In making this finding, the Court expressly relied upon the *Eastern Air Lines* case, which initially held, as a matter of law, that the use of radio to broadcast airline flight information did not constitute an intellectual or ingenious concept. 333 F.2d at 674. However, it must be noted, that upon Petition for Rehearing the author of the opin-

4. In *Kentucky Fried Chicken v. Diversified Packaging*, 549 F.2d 368 (5th Cir. 1977), Judge Goldberg, in an opinion appetizing for any connoisseur of edgework, raised the question of whether unfair competition claims are governed by the substantive law and conflicts rules of the forum State or governed by Federal common law. The issue was left unanswered, because its resolution was not important to disposition of the case. 549 F.2d at 382, n. 14.

As in *Kentucky Fried*, the parties in this case have argued the principles and case law of unfair competition of many States, so we, therefore, also decline to resolve the choice of law issue, except to the extent of examining Texas law for the possible prohibition of application of the doctrine of Reverse Confusion. *See also American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14–15 (5th Cir. 1974).

ion, Judge Hunter, expressly concurred in Judge Rives' special concurrence, wherein Judge Rives stated that the novelty question is one more properly left to a jury. 333 F.2d at 676. We cannot say, as a matter of law, that the title "The Trial of Lee Harvey Oswald" is not novel,[5] and therefore undeserving of protection as a property right.

■ The District Court also found, as a matter of law, that Capital had not revealed the title to ABC-Fries in a "confidential relationship." The Court reasoned that a "confidential relationship" could not have existed, because the film was nationally advertised in 1964. On appeal, Capital argues that, in the context of the custom of the movie industry, screenings to potential film distributors is common practice and can support the factual basis for a jury's finding that a confidential or type of fiduciary relationship exists between the parties. Furthermore, Capital argues that various agents for ABC viewed the Capital film within the abovedescribed setting and that Capital could have produced ample summary judgment evidence demonstrating these facts, if they had been given proper notice that this cause of action was to be tested by summary judgment. We agree with Capital's contentions and hold that, under certain circumstances, the practice of screening movies can support a jury's finding of "confidential relationship."

Finding no other issues requiring our determination,[6] we VACATE the judgments and REMAND the case for proceedings not inconsistent with this opinion.

5. It is interesting to note that an agent for Appellee–Fries registered a skeleton outline of the screenplay with the Writers Guild of America, in which 11 alternative titles were provided: "The People vs. Lee Harvey Oswald", "The Trial of Lee Harvey Oswald", "Lee Harvey Oswald's Trial", "The Assassin", "Trial of the Assassin", "Lee Harvey Oswald: On Trial", "Lee Harvey Oswald: Guilty or Not Guilty", "The Assassin's Trial", "Who Really Killed John F. Kennedy?", "Who Killed John F. Kennedy?", "Who Killed the President of the United States?", "An Attempt to Clarify the Circumstances Surrounding the Assassination of John Fitzgerald Kennedy".

6. For a recent case dealing with interference with contractual relations in Texas, see *Cook Industries, Inc. v. Community Grain, Inc.*, 614 F.2d 978 (5th Cir. 1980), and the cases cited therein.