**Paul T. WOLCOTT, Plaintiff,**

v.

**CHAMPION INTERNATIONAL CORPORATION, Defendant.**

**No. M85–276 CA.**

United States District Court,
W.D. Michigan, N.D.

Sept. 8, 1987.

On Motion to Alter or Amend
Judgment Nov. 10, 1987.

---

**3.** The standard of judicial review of labor arbitration awards is whether the award "draws its essence from the collective bargaining agreement." *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steel-* *workers of America v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

**1054**

Vincent R. Petrucelli, Iron River, Mich., for plaintiff.

Joseph A. Fink, Lansing, Mich., for defendant.

## OPINION AND ORDER

MILES, Senior District Judge.

This action is brought pursuant to the Michigan Whistleblowers Protection Act. M.C.L.A. § 15.361 *et seq.* The Court has jurisdiction under 28 U.S.C. § 1332.

Plaintiff alleges that he was fired on July 31, 1985 in retaliation for lodging complaints against Champion International Corporation ("Champion") with three state agencies.[1]

Now before the Court is defendant's motion for summary judgment filed pursuant to Fed.R.Civ.P. 56. The motion is supported by affidavits, exhibits, and deposition testimony. Plaintiff has not responded to the motion.

■ Summary judgment is appropriate only in those instances where the documents tendered to the Court show no genuine issue of material fact remains to be decided, and where judgment may be entered as a matter of law. *United States v. Articles of Device,* 527 F.2d 1008 (6th Cir. 1976); *Felix v. Young,* 536 F.2d 1126 (6th Cir.1976). When, as here, a motion for summary judgment is made and supported, the plaintiff cannot simply rely on his pleadings, but must present sufficient evidence as provided in the rule to demonstrate that there is a genuine issue of material fact. *Ghandi v. Police Department of the City of Detroit,* 747 F.2d 338 (6th Cir. 1984); *Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319 (6th Cir.1983); *R.E. Cruise Inc. v. Bruggeman,* 508 F.2d 415 (6th Cir.1975); Fed.R.Civ.P. 56(e). That is not to say that summary judgment will be granted as a matter of course when no opposition is made. In the interests of justice, the Court is obligated to search the record to determine whether genuine issues of material fact exist. *Bradford v. General Tel. Co.,* 618 F.Supp. 390 (W.D.Mich. 1985).

### FACTS

Plaintiff was hired as the maintenance mechanic for Champion's Lake State Region in April of 1980. Throughout his employment with Champion, plaintiff worked at the "Norway Shop" located in Dickinson County, Michigan. Plaintiff was the only full-time mechanic at the "Norway Shop" with additional seasonal help being added on occasion.

The four years prior to plaintiff's discharge saw a reduction in Champion's ownership of heavy equipment requiring mechanical attention. (Exhibit D, p. 48, 53.) On April 12, 1985, Champion held an hourly employee meeting at which plaintiff was present. The main focus of the meeting being Champion's reduction of operations in the Lake States Region including possible: closing down of district offices, cutting back on ownership and maintenance of heavy equipment, and contracting out of forest road work. It was also suggested that employees might be interested in purchasing Champion's equipment and starting their own road construction business. (Exhibit D, Deposition of Wolcott at p. 73–74.)

Plaintiff acknowledges that he did not agree with Champion's planned cutback of operations and that he gave the matter a great deal of thought. After considering the alternatives, plaintiff mailed what can only be described as a "threatening" letter to Champion. (Exhibit D, p. 77–78.) The letter reads as follows:

> This letter is being sent to both of you to ensure that at least one of will (sic) receive it. It is being set with great reluctance, but we find ourselves faced with an intolerable situation, not of our own making. We have been unable to deal with anyone here that is willing to

---

1. A second Count alleging wrongful discharge was dismissed by stipulation of the parties.

give us some honest talk. We do not like to have to make a threatening gesture, but grievances we have must be honestly addressed by this company, since the grievances are of your manufacture.

This letter, along with the as of now unpublished open letter, will be mailed on Monday, June 3rd, and sent registered. We feel this letter merits, and must have an immediate response. If it does not have an immediate response, and of a positive nature, the open letter will not remain unpublished. We shall circulate it to all newspapers within a one hundred mile radius, we shall contact television channels 3 of Escanaba, 5 of Green Bay, and 6 of Marquette. We have also given some thought to trying to interest sixty minutes in this story.

We most assuredly are not trying to blackmail this company, but we feel we must use the leverage we have to force some action on your part. Come and talk to us, that is what we ask. Adding to the second paragraph, we also have a VCR cassette, of excellent quality, in our possession detailing the deplorable shop smoke conditions, as well as the ground pollution around the shop. What we have in mind is a trade off, give us fairness, justice and good will and we will find it unnecessary to try to embarress (sic) or punish the company.

We think the most pressing problem concerns company treatment of Jack Bettiga and John Robertson. Both excellent machine operators, both permanently laid off at the same time the millsite is hiring machine operators. Now that you know the full story concerning them, I think if I were you I could not, in good concious (sic), allow this situation to continue one more minute. I believe I would immediately order these men to work at the mill, with no loss of benefits such as pension and vacation, and no loss of pay. But, that's what I would do.

Because we do not wish to be devious, nor underhanded, we must relate certain facts.

An hourly meeting was held this past March 12th. By this time it was evident the company, or your staff here, was unwilling to honor promises made to us concerning opportunities at the mill. We met prior to the meeting, and geared some questioning to see if management here would deny promises had been made. There was no denial. Further, we have counseled with an attorney and he stated we have a very good case against Champion. I have a gut feeling that is the case. However, nothing has been initiated as of yet, we all feeling (sic) honest men can reach agreements, it just gets down to people being honest. The letters and cassette, we hope, will provide an incentive.

There is also the case of other timberland employees that have sought jobs at the mill only to be told they are too dumb to do the job they've been doing for years. There is also the case of two men that have serious breathing problems, both job related.

We hourly people would like to meet with either of you at the Norway shop. I would like to show you first hand the conditions under which I have had to work for the past five years. I shall have the truck inside and prior to our meeting I will start it up and remove it from the shop. Then we can all sit down and enjoy the smoke together. If, after half an hour, you can honestly say you think the atmosphere in the shop is acceptable, I'll load my tool box and quietly go away.

By now you might be asking yourself just what the hell kind of management you have at Lake States. We welcome to have (sic) the opportunity to provide some input, also provide you with a number of names you should talk to.

Since we've learned to trust nobody, we have some rules that must be strictly adhered to. Any violation of any rule, will nullify any agreement we have tentatively made. There is to be no contact with anyone connected with Lake States. No copies of this correspondence is permitted to be sent to anyone. You must make contact with Paul Wolcott at the Norway shop, Phone 906–779–1170 or at his home phone 906–563–5553 no later

than 4 PM on Thursday, June 6th. There shall be no attempt to locate, nor remove the ground pollutants at the shop. In addition to what we've said we'll do on page one, we shall also contact the DNR departments of both the states of Wisconsin and Michigan, send copies of all this to the Governor's offices of both states, make contact with the EPA, and provide any evidence we have to any party that is interested.

I suppose you'll have to decide for yourselves whether or not any of this would bring embaressment (sic) or penalties upon the company. I, personally don't know if either state would sue, what action the feds might take, whether or not it would affect the startup of Quinnesec, whether or not Pentair would take action, nor whether the letter would be instrumental in bringing about a union at the mill—something I know you wish to avoid. I think there is also the possibility an enormous number of yars (sic) of dirt here at the shop might have to be purified.

As to the pollution, we insist it be cleaned up, but have no objection to the company disposing of it quietly.

So Bob, Andy, the ball is in your court. On Friday morning, any agreement on our parts will be null and void and we shall consider the company does not wish to deal with us. We honestly feel you will, since we can do that which we've said we'll do and then still take court action. It will have shown we were willing to try.

The main point is, we all need jobs, we want to work for Champion, but we've been backed into this damned corner, and like the timid little mouse, we're ready to take on all comers.

Sincerely,

Paul T. Wolcott

After reading this account, I think a footnote is necessary. As to Jack Bettiga.

He has been operating equipment at eight dollars and some odds (sic) cents per hour. As promised, he thought he would be into the mill where the starting pay is from 11.50 to 12.50 per hour. This represented a fifty per cent raise roughly. Who did the promising? Mostly Jeff Nickels (since fired), but in the presence of Dick Black and Judy Callevi. neither denied the promise at the time. It was made several times in front of the whole hourly crew, and to us individually. As I understand it Bettiga wrote to Mr. Seigler. He then gave the matter to an underling to handle. Then, by letter, Jack was instructed to call Bob Young for an explanation as to why he would not be hired. If that wasn't so goddamned sick, it would be funny. Right now, I feel a little like Ralph Nader must have when he submitted "unsafe at any speed" to his publisher.

The "open letter" mentioned above was addressed to "all who will be working at Champion's Quinnesec Mill on an hourly basis." In the six-page letter, plaintiff set forth his grievances regarding Champion's hiring practices, dumping of wastes into the environment, and working conditions, in a rambling fashion. Plaintiff testified that the primary purpose of the letter was to get back the jobs of laid-off workers and to air gripes. (Exhibit D, p. 86.) The threatening letter was sent to Champion's offices on or about June 1, 1985. (Exhibit D, p. 78.).

Upon receipt of the letter, Champion consulted James Jones ("Jones"), an employee relation specialist. Jones met with plaintiff and investigated the allegations contained in the letter. (Exhibit K.) As a result of this incident, plaintiff was suspended with pay for a one-week period pending investigation of the allegations. A letter documenting the disciplinary action was placed in plaintiff's file.[2]

2. "This letter, a copy of which is to be placed in your personnel file, is acknowledgement of disciplinary action to you for the improper and unacceptable approach you took in your letter to Mr. Sigler and Mr. Longbine.

While it was not improper for you to write Mr. Sigler and Mr. Longbine to express your complaints and concerns, it was definitely wrong for you to use a threatening approach which was nothing less than blackmail.

On June 14, 1985, Richard Black of Champion recommended that the mechanic's position for the Lake States Region be eliminated, citing the proposed cutbacks in the company's ownership of heavy equipment. (Exhibit P.)

On June 17, 1985, plaintiff filed a complaint with the Michigan Department of Public Health–Occupational Health Division complaining of, among other things, improper ventilation at the Norway shop. (Exhibit A, Exhibit D at p. 141.) Sometime after June 17, 1985, plaintiff filed a complaint with the Michigan Department of Natural Resources ("DNR"), alleging that Champion may have polluted the environment by dumping oil and solvents into the ground at the Norway shop. (Exhibit D, p. 140–141.) At about the same time, plaintiff filed a complaint with the Michigan Department of Labor claiming that Champion illegally discriminated against him in his employment relationship. (Exhibit A.)

Regarding plaintiff's complaint to the DNR, it is noteworthy that plaintiff admits dumping oil and solvents at the Norway shop. Plaintiff did so without being so instructed and without requesting proper disposal containers from Champion. He alleges that he was following a customary practice based on his observation of presumed oil dumping areas in existence when he began working at the Norway shop. (Exhibit D, p. 103–105.)

On July 19, 1985, Richard Black, noting a decrease in company-owned equipment, again recommended eliminating the mechanic's position in the Lake States region which plaintiff occupied.

> The districts that will still be building their own roads with company equipment are Ontonagon, Norway, and Iron River and they will have only the basic complement of equipment. The only addition to that will be the two pulpwood loaders that we will purchase for the two woodyards later this summer. I don't feel that a full-time mechanic is justified for this small amount of equipment. (3 bulldozers, 3 motor graders, 3 low-boys, and 2 new pulpwood loaders.)

(Exhibit R.)

On July 29, 1985, the recommendation to eliminate the mechanics position in the Lake States region reached Champion Vice President Dan Wilder. As with all previous recommendations, it was noted that a full-time mechanic's position could not be justified in light of the reduction in Champion's heavy equipment in the region.[3]

On July 31, 1985, plaintiff was notified that his position as mechanic for the Lake

---

You should have known that your concerns would have been properly investigated and addressed without resorting to threatening tactics. Hopefully now that you have had time to reflect on your actions, you will realize this and will not engage in such activity again.

Your suspension from work, with pay, effective June 7, 1985 will be ended upon your return to work on June 17, 1985."

**3.** "After reviewing the situation with both Blaine Bloomgren and Dick Black, concerning Mr. Wolcott's present position, the following are the background facts supporting the Timberlands' decision to eliminate the maintenance mechanic's position at the Lake States Region.

1. The Lake States Region has reduced the number of their active districts to five (5) from six (6) and subsequently eliminated many pieces of equipment the maintenance mechanic formerly had to work on.

2. In the past couple of years we have gone from ten (10) equipment operators to the present number of six (6) and one of these is out on LTD. Most of our road building program is now contracted out.

3. Normal maintenance (lube, oil, etc.) on our equipment is the responsibility of equipment operators and there is almost no need for a full-time maintenance mechanic.

4. Two of the five (5) active equipment operators will be moving into the woodyards at Iron River and Wakefield. These men will be operating new pieces of equipment and no maintenance other than lube and oil change is contemplated. This will leave the region with only three (3) full-time equipment operators.

5. Lake States figures elimination of maintenance shop and mechanic at Kingsford will result in a savings of $65,000/year.

The maintenance mechanic was used primarily for engine overhauls, transmissions and track jobs. With the substantial decreased pieces of equipment now being used, as contrasted to what we previously had operating on a daily basis, there is no longer any justification for a full-time maintenance mechanic.

It is contemplated that any work that will be necessary in the future can be performed by bringing it to a local garage."

States region was being terminated. (Exhibit T.)

## DISCUSSION

The Michigan Whistleblowers Protection Act M.C.L.A. § 15.361 *et seq.*, (the "Act") provides in pertinent part:

Sec. 2   An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to the Public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Id at § 15.362.

The purpose of the Act is to "protect the public by protecting employees who report violations or laws and regulations." *Hopkins v. City of Midland,* 158 Mich.App. 361, 404 N.W.2d 744, 749 (1987).

The Act, which is a fairly recent addition to the Michigan Statutes, has yet to be interpreted by the Michigan Supreme Court. Consequently, there exists little Michigan law setting forth the elements necessary to present a claim under the Whistleblower Act. Those decisions which have discussed the Act, have drawn heavily on the framework set forth for employment discrimination actions under both Michigan and Federal Law. (Elliot Larson Act; M.C.L.A. § 37.2101 et seq.; Title VII, 42 U.S.C. § 2000e *et seq.; Melchi v. Burns Intern. Sec. Services Inc.,* 597 F.Supp. 575 (E.D.Mi. 1984); *Clark v. Uniroyal Corp.,* 119 Mich. App. 820, 327 N.W.2d 372 (1982).

■ In accordance with the above-mentioned case law, it is necessary for plaintiff to demonstrate the following in order to establish a *prima facie* case of retaliation under the Act:

1.) That the plaintiff engaged in protected activity as defined by the Act;

2.) That the plaintiff was subsequently discharged from employment; and

3.) That there is a *causal* connection between the protected activity and the discharge.

*Melchi supra* at 582.

■ Once plaintiff has established a *prima facie* case of retaliation, the burden shifts to the defendant to articulate some legitimate non-retaliatory reason for its actions. *Id.* at 582. If defendant is able to articulate a legitimate non-retaliatory reason for its action, plaintiff retains the opportunity to demonstrate that the proffered reasons were a mere pretext for retaliation and thus prevail under the Act. *Id.* at 582.

This shifting burden of proof does not preclude the granting of summary judgment in a Whistleblower action. *See Clark v. Uniroyal,* 327 N.W.2d at 373. Once a legitimate non-retaliatory reason for the employer's action is given, the plaintiff must present factual allegations raising a triable issue of fact as to whether the proffered reasons were a pretext. *Id.* It is to be noted that the evidence offered in establishing a *prima facie* case will be considered, and in some instances may suffice, in determining the existence of triable issues of fact on the question of pretext. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 255 note 10, 101 S.Ct. 1089, 1095 note 10, 67 L.Ed.2d 207 (1981); *Toney v. Block,* 705 F.2d 1364, 1367 (D.C.Cir.1983).

■ Considering the facts before it within the above-enunciated framework for decision-making, the Court finds that plaintiff has not established a *prima facie* case of retaliation under the Act. In reaching this decision, the Court finds the following factors to be particularly relevant:

Plaintiff engaged in activity protected by the Act, albeit only after attempting what can only be termed an attempted act of extortion with the protected information. The fact that plaintiff was discharged after engaging in the protected activity is also

without question. However, the Court finds that there is no causal connection between plaintiff's protected conduct and his discharge.[4]

As noted, plaintiff was aware of the planned down-scaling of Champion's heavy equipment operations for several months prior to his Whistleblower activities. He was also aware of inadequate ventilation and pollution problems at the Norway shop for a number of years prior to notifying the authorities. (*See* Exhibits A and D.) In fact, plaintiff was one of the persons who engaged in the dumping of oil and solvents into the soil at the Norway shop. (Exhibit D, p. 141.) Yet, Plaintiff did not exercise his civil duty by reporting these violations, as envisioned in the Act, until it became apparent that he and others might lose their jobs due to circumstances unrelated to the violations.[5]

The Whistleblower Act was not intended to serve as a tool for extortion. Those availing themselves of its protection should be motivated, at least in part, by a desire to inform the public about violations of laws and statutes, as a service to the public as a whole.[6] Plaintiff clearly fails to meet these criteria. His lack of concern for the public safety is evidenced by his own participation in polluting the environment as well as his willingness to forgo reporting these alleged violations of the law in exchange for jobs. This blatant lack of concern for the environment is appalling. Furthermore, plaintiff's subsequent attempt to legitimize his extortive actions via this lawsuit is scandalous and borders on abuse of process.

The complaint is hereby dismissed.

IT IS SO ORDERED.

## ON MOTION TO ALTER OR AMEND JUDGMENT

Plaintiff has filed a motion to alter or amend judgment pursuant to Fed.R.Civ.P. 59(e). He has also requested additional time within which to respond to defendant's motion for summary judgment. Defendant has opposed the motions and has filed responsive pleadings. Pursuant to plaintiff's request, oral arguments were held and the motions are now ready for decision.

### *Procedural History*

The present action was filed on September 25, 1985. The complaint alleged violations of the Michigan Whistleblowers Protection Act, Mich.Comp.Laws Ann. § 15.361 *et seq.*, (Act), and breach of an employment contract commonly known as a "Toussaint" claim. The "Toussaint" claim was subsequently dismissed by stipulation of the parties. On June 3, 1987 this Court entered an order scheduling events in the above-entitled action. The order provided for a July 15, 1987 motion deadline and noted that a jury trial would be set for the September trailer docket.

On July 15, 1987 defendant filed a motion for summary judgment supported by affidavits, deposition excerpts and exhibits. Plaintiff failed to respond to the motion until after it was granted.[1] On July 30, 1987 the Court mailed an amended trailer docket to the parties. The trailer docket, which included the case *sub judice* was to

---

**4.** Moreover, if such a connection were found to exist, defendant has more than rebutted any presumption of retaliation by offering evidence that the phase-out of plaintiff's position was contemplated long before plaintiff engaged in activities protected under the Act. (*See* Exhibits C and attachments D, E, F, I, P. R and S.) In light of the evidence, plaintiff has failed to present factual allegations raising an issue of fact on the question of pretext, nor are the allegations contained in the complaint sufficient to present the same.

**5.** As noted, Champion was in the process of conducting internal investigations regarding the

cutbacks which eventually resulted in termination of plaintiff's position prior to plaintiff's Whistleblower activities.

**6.** The *Melchi* court held that only those acting in good faith are protected by the Whistleblowers Act. *Melchi supra* at 583.

**1.** Plaintiff attempted to file a response to the motion for summary judgment after he learned of the Court's opinion granting the motion. The Court clerk did not accept the motion for filing, since the case was already closed. Subsequently, plaintiff filed the motions now under consideration.

commence on September 22, 1987. On September 8, 1987, some fifty-five days after defendant filed its motion for summary judgment, this Court granted the motion.

### Request for Additional Time to Respond to Rule 56 Motion

■ Plaintiff has requested an extension of time in which to respond to the rule 56 motion. While such motions are usually granted as a matter of course, they are generally made in a timely fashion and not after the case has already been dismissed. Accordingly, the motion for extension of time is denied. In reaching this determination the Court notes that much of plaintiff's argument in support of his motion to alter or amend judgment addressed the merits of the action and this Court's dismissal thereof. The Court has considered these arguments in conjunction with plaintiff's motion to alter or amend; thus giving *de facto* consideration to his opposition of defendant's motion for summary judgment.

### Motion to Alter or Amend Judgment

Plaintiff contends that the judgment in this matter must be "reversed or vacated" for the following reasons:

1. The Court erred in failing to review the entire record before granting defendants motion;

2. Plaintiff was denied due process since he was not given ten days advance notice that the motion for summary judgment was going to be heard or that it would be taken under advisement as of a certain date;

3. Plaintiff has established a *prima facie* case of retaliatory discharge under the Michigan Whistleblowers Protection Act and is entitled to its protection.

For the following reasons plaintiff's motion to amend or alter judgment is denied.

### Failure to Review the Entire Record

■ Plaintiff contends that the Court failed to review "the entire record" before issuing its opinion. Local Rule 10(b)(1)(C) provides:

If interrogatories, requests, answers, responses or depositions are to be used at trial or are necessary to a pretrial motion which might result in a final order on any issue, the portions to be used shall be filed with the Clerk of the Court at the outset of the trial or at the filing of the motion insofar as their use can be reasonably anticipated.

This local rule, which is in compliance with Fed.R.Civ.P. 5(d), does not require dispositive motions to be supported by a copy of every document obtained or deposition taken through the date of the filing. The rule requires only that those portions which are reasonably necessary for resolution of the matter be filed. As the Supreme Court recently held, a motion for summary judgment does not have to be supported by any affidavits or deposition transcripts:

Regardless of whether the moving party accompanies it's summary judgment motion with affidavits, the motion may, and should be granted so long as whatever is before the district court demonstrates that the standard for entry of summary judgment as set forth in Rule 56(c), is satisfied. One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Defendant filed the exhibits, depositions, and affidavits which it reasonably anticipated would be necessary for the Court's decision of the motion. Plaintiff failed to respond or offer counter affidavits as contemplated by rule 56. However, contrary to the *Smith* opinion cited by plaintiff, this Court did not use plaintiff's failure to respond as a basis for its decision. *See Smith v. Hudson,* 600 F.2d 60 (6th Cir. 1979) *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). It considered all the evidence properly on file before rendering its decision and found that the standards set forth in rule 56(c) required dismissal of the action. *Celotex Corp. supra.* Furthermore, the Court has reviewed the additional depositions and attachments offered in support of the present

motion. It finds nothing therein requiring it to alter or amend its judgment.

### Due Process Deprivation of Notice Requirement under Rule 56

Plaintiff contends that this Court is required to set all rule 56 motions for hearing or, in the alternative, give the parties ten days notice that the motion is going to be taken under advisement as of a certain date. In support of this contention plaintiff cites *Capital Films Corp. v. Charles Fries Production, Inc.*, 628 F.2d 387 (5th Cir.1980).

The Federal Rules of Civil Procedure provide:

> The motion shall be served at least 10 days before the time fixed for hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Fed.R.Civ.P. 56(c).

While rule 56 contemplates a "hearing" on the motion, oral argument is not mandated as evidence by rule 78 which provides in pertinent part:

> To expedite its business the court may make provision by rule or order for the submission and determination of motions without oral hearing upon brief written statements of reasons in support and opposition.

Fed.R.Civ.P. 78.

Consistent with rule 78, the Western District of Michigan has promulgated local rule 29 which provides that nondiscovery motions must be accompanied by a written brief, that a copy of the motion must be served upon the opposing party, and that any party opposing the motion may "within ten (10) days after being served" file a reply to the motion. W.D.Mich.R. 29(a). The rule also provides that counsel may request oral argument and that the Court may schedule oral arguments upon request or upon its own motion; however, oral argument is discretionary, not mandated as plaintiff alleges. The Court may also dispose of the motion in the following manner:

> [I]t (the Court) may proceed after filing of a response to the motion, *or upon the expiration of said ten (10) days if no such response is filed,* to dispose of the motion by entry of an appropriate order.

(Emphasis added.) *Id.*

In *Capital Films, supra,* the lower court treated a motion to dismiss as one for summary judgment and subsequently granted summary judgment after informing the parties that it was not going to rule on the motion. *Id.* at 391. The court of appeals vacated the judgment and remanded the case for further consideration noting:

> At no time in the proceedings was Capital given notice that as of a certain date, the district court would take the case under advisement. Consequently, Capital has been denied the safeguards guaranteed by Rule 56.

*Id.* at 392.

Since W.D.Mich.R. 29 allows the Court to enter an order granting or denying an unopposed motion within ten days after it is filed, it provides all the notice required under rule 56. Plaintiff's counsel was aware of W.D.Mich.R. 29 and that awareness is demonstrated by his attempt to selectively quote the rule in support of plaintiff's motion. Counsel alleges that local rule 29 requires the Court to set the motion for hearing or give notice that it will be taken under advisement as of a certain date. Counsel's *post facto* interpretation of local rule 29 does not change the plain language of the rule, which provides all the notice required under rule 56(c). *Daniels v. Morris,* 746 F.2d 271 (5th Cir. 1984). *Daniels,* which was decided after *Capital Films,* held:

> Rule 56(c) does not require that a party be given advance notice of a 'date cer-

tain' on which a motion for summary judgment is to be decided.

*Id.* at 275. Here, as in *Daniels* the local rules provided for a definite time period within which the parties might respond to dispositive motions. "[T]hese rules put appellants on notice that the district court could decide the motion at any time after 20 days had passed from the time it was filed." *Id.* at 275. The sixth circuit also requires only that the party against whom summary judgment is entered receives advance notice and an adequate opportunity to respond to the motion. There is no requirement that the court invite a response, or that it provide notice of its intent to treat a rule 12 motion as one for summary judgment, as was required in *Capital Films. Kistner v. Califano,* 579 F.2d 1004 (6th Cir.1978).

■ Plaintiff had notice that a motion for summary judgment had been filed.[2] He did not request oral arguments on the motion. He had ample opportunity to respond in the seven weeks prior to the Court's entry of judgment. He was aware of local rule 29 which clearly sets forth the actions the Court may take upon such motion and provides notice that an appropriate order disposing of the motion may be entered after passage of the ten day response period. Accordingly, plaintiff was afforded all the due process required under the federal and local rules.

Plaintiff's counsel also asserted that this Court lead him to believe that the case would proceed to trial without a ruling on the pending motion for summary judgment. Counsel alleges he was mislead by the Court's inclusion of the case on its September 1987 trailer docket. This argument was not contained in the motion to amend or alter judgment, or the brief attached thereto.

The Court does not accept counsel's scenario of being lulled to sleep by the Court in this matter. Counsel was served with a timely filed copy of the motion for summary judgment. He knew, or should have known, that the motion could result in dis-

missal of the action. Assuming that the Court would ignore such a motion without any inquiry on his part is not a good excuse for failing to respond to the motion. Furthermore, the Court notes that counsel's argument appears to be an attempt to salvage the post *Daniels v. Morris* value of *Capital Films* by equating this Court's scheduling of a trial date with the *Capital Films* court's statement that the motion would not be decided. The facts in the case *sub judice* do not lend themselves to this strained interpretation. *See also Daniels, supra,* and *Kistner, supra.* Finally, as a matter of common sense and judicial economy, few cases would proceed to trial in a timely fashion if they could not be tentatively set for trial prior to the Court's deciding all outstanding motions.

Plaintiff's assertion that he was mislead into inactivity by the Court is without merit.

### Error on the Merits

A. Genuine issues of fact.

Plaintiff contends that "genuine issues of fact" precluded the granting of summary judgment in this matter. Plaintiff asserts that these facts would have been revealed if the entire record had been available for the Court's review.

The Court's September 8, 1987 decision embodies three separable bases for the dismissal of the above-entitled action. This Court found that plaintiff failed to establish a *prima facie* case under the Whistleblowers Act; that assuming a *prima facie* case was established, the same had been rebutted by the uncontroverted evidence offered by the defendant, and finally, that plaintiff was not entitled to whistleblower protection.

Plaintiff has supported his motion with numerous attachments as well as nine deposition transcripts. After review of the proffered documents and depositions, the Court finds no evidence that defendant's decision to close down the Norway Shop and discharge plaintiff was based upon, or

---

**2.** During oral arguments plaintiff's counsel admitted receiving a copy of defendant's motion for summary judgment some time before July of 1987.

made in response to, plaintiff's alleged "whistleblower" activities.

Plaintiff acknowledges that he was aware of a planned scale-back of activities prior to writing his threat letter. [Wolcott deposition of February 10, 1986 at pgs. 73, 74, 75, 117, (hereinafter Wolcott dep.)]. Plaintiff testified that in his opinion, the plan to scale down operations was made to keep union activity out of the Quinnesec Mill. (Wolcott dep. at 123). He subsequently testified that to his knowledge defendant did not know of the union talk going around. (Wolcott dep. at 126). Finally, in this action plaintiff asserts that the scale-down of operations and closing of the Norway shop was accomplished in retaliation for his purported "Whistleblower" activities. That position is not supported by the totality of plaintiff's deposition testimony. It is also rebutted by the uncontroverted evidence offered in support of defendant's motion for summary judgment, cited in the Court's September 8, 1987 opinion.

In order to survive a motion for summary judgment a party must point out the existence of "genuine" issues of fact.

> When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'

*Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Plaintiff has failed to meet this burden either before dismissal of this action or through his subsequent motion to alter or amend judgment. Gainsaying by itself does not establish the existence of genuine issues of fact. *See also,* Summary Judgment Under Federal Rules, 99 F.R.D. 465 (1983), regarding material facts required to withstand motion under rule 56.

**B. Whistleblowers Act.**

Plaintiff contends that the Michigan Whistleblowers Protection Act protects those who report suspected violations while under a subjective good faith belief that a violation of the law has occurred. Plaintiff argues that his whistleblowing activities meet the subjective good faith test and should therefore be protected. Plaintiff contends that this Court erected an additional barrier by requiring whistleblowers to be motivated by a desire to inform the public.

Assuming plaintiff has presented an unrebutted *prima facie* case of retaliatory discharge under the Act, he would still not be entitled to its protection. Renewed review of plaintiff's deposition again impresses the Court that plaintiff's intention was to report the alleged violations of defendant only if he and his friends were denied jobs at the Quinnesec Mill. (Wolcott dep. at 154–156). Nowhere in the plethora of documents submitted by plaintiff is there any indication that good faith or the interests of society as a whole played any part in plaintiff's decision to go to the authorities.

Also noteworthy are plaintiff's misstatements in his report to the Michigan Department of Labor and O.S.H.A. By comparing plaintiff's deposition testimony at pages 155 through 167 and 172 through 179 with the reports submitted to these agencies, (set forth in defendant's motion for summary judgment, exhibit A), it is obvious that plaintiff was submitting a laundry list of "gripes," not violations of the law.[3]

---

**3.** In a report to the Michigan Department of Labor plaintiff made the following allegations: that hiring at defendant's Quinnesec Mill was conducted in a manner evidencing "union avoidance," that defendant "steadfastly refused to provide ventilation equipment" in spite of plaintiff's complaints, that he was punished for requesting an O.S.H.A. investigation by having his hours cut, that during his time off from work the company had sold "a years accumulation of junk parts etc." for two hundred and forty dollars and had taken the money. Plaintiff alleged "this junk money has always been used by the hourly employees as a sort of slush fund, and so I feel that this is another act by the company to punish us." Plaintiff also complained that his uniform allowance was taken away.

In his complaint to O.S.H.A. plaintiff wrote:

I started work for Champion in the spring of 1980. Immediately I became aware the garage could not be purged of exhaust and welding fumes. Complaints made by me and requests for ventilation equipment were ignored.

(Exhibit A to defendant's motion for summary judgment).

Wolcott later testified that once he requested ventilation equipment it was provided. (Wolcott dep. at 92–99). Plaintiff's blatant attempt to exacerbate any existing ventilation problem prior to an O.S.H.A. inspection by effectively closing off the shop is also enlightening. (*See* Wolcott dep. at 172–179). It is hard to find any "good faith subjective belief of illegal activity by defendant" in many of plaintiff's allegations.

Plaintiff also reported defendant for illegally dumping oil and chemicals at the Norway Shop. There is no denying that such activities occurred; however, even here plaintiff was deeply involved in the illegal activity and failed to report it until it was in his best interest to do so. As noted in the Court's September 8, 1987 opinion, plaintiff himself disposed of oil and chemicals by pouring them on the ground. He did so without being told to do so, without requesting proper disposal barrels, and he continued to do so for months after he allegedly first became aware that such disposal was illegal. (*See* Wolcott dep. at 102–105).

Thus, the Court is presented with a plaintiff who: continued polluting the environment even after he became aware of the illegality of his acts; who made material misrepresentations in his reports to the authorities; who attempted to extort jobs by threatening to report defendant to the authorities for violating the law; and who reported his employer for violating laws in retribution for the employer's failure to meet his demands.

In spite of these facts which emerge from plaintiff's own testimony, it is plaintiff's assertion that he is entitled to whistleblower protection.

In his deposition plaintiff testified as follows:
Q. Okay. And then when you ultimately advised the company that this exhaust fan did not appear adequate—
A. Yes.
Q. —then the company, within three or four months, got the exhaust fan that did work. Isn't that correct?
A. Yes.
(Wolcott dep. at 95–96).
Q. All right. Now bracket number five, you say that for five years while you were employed with the company, you complained about exhaust fumes and you asked for ventilation and the company never provided you a ventilator?
A. That's right.
Q. That wasn't true was it?
A. Well, it may have been just a little shorter period of time.
Q. It wasn't true. That statement wasn't true, was it?
A. That's right.
(Wolcott dep. at 157–158).
Regarding the allegation of punishment re: a forty hour work week plaintiff testified as follows when asked whether he knew his hours had been reduced to punish him:
Q. And so you had no knowledge of something you put down in a—in the document to the Michigan government. Right?
A. That's right.
Regarding the sale of scrap plaintiff testified:
Q. Now, where did this scrap come from?
A. Rebuilding of engines and so on.
Q. Owned by the company?
A. Yes.
Q. Okay. So, this was company scrap?
A. Yes.
Q. Right?
A. Yes.
Q. And so during clean up while you were gone for that week around the shop, the company apparently called a junk dealer and sold the scrap. Right?
A. Yes they did.
(Wolcott dep. at 160).
Plaintiff also testified that his uniform allowance was discontinued months before any alleged "whistleblowing" took place, yet this complaint was also contained in a report to the state department of labor. (Wolcott dep. at 162, 163).

When viewing these complaints in context of the facts before the Court as well as plaintiff's deposition testimony, it becomes very difficult to see the relevancy of many of these complaints to the allegation that plaintiff was punished for alleged whistleblower activities. It is also difficult to imagine how these alleged actions amounted to presumptive violations of the law by the defendant. The allegation that defendant cannot sell its own scrap, or that keeping money from sale of property owned by defendant is a violation of law and/or punishment of plaintiff is utter nonsense.

The Court does not agree and reiterates its earlier holding that the Act does not apply to plaintiff's activities.

In *Melchi v. Burns Intern. Sec. Services, Inc.,* 597 F.Supp. 575 (E.D.Mi.1984), the court held that "employees must not be permitted to use the statute (the Michigan Whistleblowers Act) in a purely offensive manner by reporting violations known to be false. By precluding protection to those acting in bad faith, the legislature clearly implied that only those acting in good faith are entitled to protection." *Id.* at 583. As previously noted, some of plaintiff's allegations were false by his own admission, others were plainly nonsensical. Furthermore, he reported actual violations only after an extortive *quid pro quo* failed.

In a federal whistleblower action an appellate court held that the primary motivation of an employee availing herself of whistleblower protection must be a desire to inform the public on matters of public concern, and not personal vindictiveness. *Fiorillo v. U.S. Department of Justice,* 795 F.2d 1544 (Fed.Cir.1986). Wolcott clearly did not have the public interest in mind while threatening to report defendant unless jobs at the Quinessec Mill were forthcoming.

It is also noteworthy that plaintiff's attempt to shield himself through use of the Whistleblowers Act would put him in a better position than he would have been had he not reported the alleged violations. In *Warren v. Department of Army,* 804 F.2d 654 (Fed.Cir.1986) the court cautioned against such use of the federal whistleblower statute. Citing *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) the court noted that purported whistleblower claims must be viewed in light of any independent grounds for the allegedly illegal reprisal to assure that the whistleblower does not better his position by blowing the whistle. Here there is overwhelming evidence to support defendant's contention that the Norway Shop was closed for economic reasons. As previously noted, these plans were under consideration and had been partially implemented prior to plaintiff's whistleblower activities. Consequently, plaintiff's attempt to acquire through the Whistleblowers Act that which he could not have without blowing the whistle, is suspect.

The same analysis was applied in *Quinton v. Department of Transportation,* 808 F.2d 826 (Fed.Cir.1986). In that federal whistleblower action, plaintiff's claim to be a whistleblower was rejected since her whistleblowing activities occurred after the decision to audit her office, which eventually lead to her discharge, was made. The court held: "the element of retaliation, based on disclosure, required to invoke whistleblower protection was absent." *Id.* at 829. Similarly, in this action the economic business decisions which eventually lead to plaintiff's discharge were made long before the belated whistleblowing took place.

Finally, in *Johnson v. Benson,* 128 Wis. 2d 560, 384 N.W.2d 367 (table), No. 84–2531 (Wis.Ct.App. Jan. 16, 1986) (Lexis, States Library, Wis. file), the state court of appeals rejected plaintiff's claim that he was a "whistleblower" under a judicially created exception to the at-will employment doctrine. The court held:

Where an employee acts to protect the ·public interest by preventing, or attempting to prevent, an unlawful or improper act, *Brockmeyer* affords that employee protection from retaliatory action by the offending employer. Where however, an employee acts unlawfully or on behalf of his or her employer and keeps the matter quiet for more than a year, eventually revealing it not to the appropriate authorities or even to others for the purpose of preventing public injury, but rather for some other limited and private purpose, however laudable that purpose may appear to the employee, no such protection is afforded. Were we to adopt Neil's argument we would be discouraging disclosure and correction of unlawful or improper acts by encouraging employees to 'go along' and then keep quiet reserving comment or disclosure until a

time best suited to the advancement of their own interests.

*Id.*

Similarly, if this Court countenanced Wolcott's conduct, it would encourage other employees to hold off blowing the whistle until it becomes most advantageous for them to do so. Plaintiff has offered no evidence which suggests that the Michigan legislature intended the Whistleblowers Act to be used as an offensive weapon by disgruntled employees. Plaintiff's renewed allegation that he is entitled to whistleblower protection is without merit.

### Summary

Defendant's motion for summary judgment is confirmed; plaintiff's motion to alter or amend is denied; and plaintiff's motion to extend is denied.[4]

IT IS SO ORDERED.

When your job is on the line
but you've worked, put in your time
don't despair or lose your cool
dump some oil, now who's the fool
bribe the management and make them bristle
if all else fails, just blow the whistle

no response, so you try court
but your time there may be short
because your claim did not have merit
you were dismissed, now grin and bear it
hereby DENIED are a motion to amend
as well as one filed to extend.