Keith Daniel CENTAMORE, Plaintiff,

v.

THE CITY OF HOUSTON, the Houston Police Department, and Robert B. Hayden, Defendants.

No. CIV. A. H–96–632.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 10, 1997.

Jimmy Lee Peacock, Houston, TX, for Plaintiff.

Murray Edward Malakoff, City of Houston Legal Dept., Houston, TX, for Defendants.

### *MEMORANDUM AND ORDER*

ATLAS, District Judge.

This lawsuit arises out of the sexual assault of Plaintiff by a police officer, and related events. The Defendant City of Houston ("Defendant" or "City") has moved for summary judgment · on all Plaintiff's claims against the City. *See* Defendant City of Houston's Motion to Dismiss, or, for Summary Judgment and Supporting Memorandum [Doc. # 39] ("City's Motion").[1] Plaintiff Keith Daniel Centamore ("Plaintiff") has responded in opposition. · *See* Plaintiff's Response and Memorandum in Opposition to Defendant City of Houston's Motion to Dismiss, or, for Summary Judgment [Doc. # 44] ("Plaintiff's Response"). For the reasons stated herein, the City's Motion is **DENIED.**

### I. *FACTUAL BACKGROUND*

#### A. *Underlying Sexual Assault*

This action stems in part from events alleged by Plaintiff to have happened on or about February 7, 1994. According to Plaintiff, at approximately 1:30 a.m. he noticed a vehicle at the end of his street that appeared to have been run off the road. *See* Plaintiff's Original Petition (Exhibit A to Notice of Removal) ("Petition"), at 3. Because he had

---

1. Because the parties have submitted, and the Court has considered, numerous documents relating to the parties' transactions that are outside the pleadings, it is necessary to treat the City's Motion as a motion for summary judgment. Rule 12(b) requires the court under these circumstances to treat the motion as one for summary judgment and to dispose of it as required by Rule 56. *See Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); *Jackson v. Procunier,* 789 F.2d 307, 310 (5th Cir. 1986). Whenever a motion to dismiss is treated as a motion for summary judgment, the nonmovant is entitled to the procedural safeguards of Rule 56. *See Isquith v. Middle South Utils., Inc.,* 847 F.2d 186, 195 (5th Cir.1988); *Capital Films Corp. v. Charles Fries Productions, Inc.,* 628 F.2d 387, 391 n. 1 (5th Cir.1980).

no telephone, Plaintiff drove to a convenience store nearby and called "911," seeking assistance. While returning home, Plaintiff hailed Defendant Robert B. Hayden ("Hayden"), who was sitting in a marked Houston Police Department ("HPD") vehicle. Hayden followed Plaintiff to the scene, allegedly to investigate Plaintiff's report. *See id.*

When they arrived at the scene, Hayden advised Plaintiff that Plaintiff's vehicle registration tags had expired, and instructed Plaintiff to enter the front seat of the police car while Hayden verified the status of Plaintiff's car. Hayden questioned Plaintiff about Plaintiff's criminal history. Plaintiff responded that he had been in prison and was currently on bond for knife possession. *See id.*

Plaintiff claims that Hayden questioned Plaintiff about his sexual experiences in and out of prison. Hayden allegedly then began a "body search," running his hands up Plaintiff's leg and fondling Plaintiff's genitals. *See id.* at 3–4. When Plaintiff jumped back and questioned Hayden, Hayden took off his weapon and told Plaintiff to relax, that he would enjoy it. Plaintiff attempted to move and asked Hayden to release him. Plaintiff contends that Hayden ordered Plaintiff to be still, and then performed oral sex on Plaintiff and masturbated. *See id.* at 4.

Plaintiff claims that Hayden released him at approximately 3:15 a .m., warning Plaintiff that he could use Plaintiff's parole status against Plaintiff, should Plaintiff attempt to report the incident. *See id.* Hayden then allegedly handed Plaintiff a piece of paper on which he had written "Rob" and his beeper number, telling Plaintiff he would learn to enjoy himself after a few more visits. *See id.*

Plaintiff alleges that he reported the incident to the HPD later that same morning. *See id.* Apparently, HPD officers from the Internal Affairs Division ("IAD") investigated the incident and attempted to set a trap for Hayden at Plaintiff's house. The IAD investigation substantiated Plaintiff's allegations against Hayden. *See* Inter Office Correspondence, S. Nuchia to Firefighters' and Police Officers' Civil Service Commission of the City of Houston, dated June 8, 1994 (Exhibit C to City's Motion).

### B. *HPD Rules and Procedures*

HPD's Rules Manual prescribes the rules of conduct for Houston police officers. Specifically relevant to this lawsuit, the rules provide that officers will abide by all laws and ordinances, that they shall not commit any act "tending to bring reproach, discredit, or embarrassment to their profession or the department," and that they will respect the rights of individuals and not engage in discrimination, oppression, or favoritism. *See* Houston Police Department Rules Manual (Exhibit A to City's Motion) ("Rules Manual"), Rules 1.2, 2.3, & 2.5.

Furthermore, HPD's official policy is "that officers shall treat *all* prisoners, suspects and other citizens in a fair and humane manner." *See* General Order No. 500–20 (Exhibit A–4 to City's Motion). This policy is further implemented by guidelines that provide, *inter alia*, that officers "shall refrain from all unnecessary contact with prisoners, suspects or citizens." *See id.*

In order to enforce these policies, the HPD has a mechanism for investigating complaints by citizens against officers that includes the Internal Affairs Division. *See* General Order No. 200–3 (Exhibit A–1 to City's Motion). When an officer's performance or competence for duty is in question, HPD has a "Personnel Concerns Program," which identifies negative behavioral patterns and develops strategies to reverse such patterns. *See* General Order No. 300–24 (Exhibit A–2 to City's Motion). This program was in effect prior to the incident that is the basis of this suit, *see id.*, and Hayden was participating in the program at the time of the alleged assault. *See* Inter Office Correspondence, S. Nuchia to R. Hayden, dated March 24, 1993 (Exhibit B to City's Motion).

### C. *Hayden's Employment History*

Hayden's employment history with the HPD, marked by numerous complaints and problems, sparked concern within HPD administration. In October 1992, the Administrative Disciplinary Committee recommended to Chief of Police Sam Nuchia ("Chief Nuchia") that Hayden be referred to

the Personnel Concerns Program "for further evaluation due to his extensive complaint and disciplinary history." Inter Office Correspondence, J.L. Dotson to S. Nuchia, dated Oct. 7, 1992 (Exhibit B to City's Motion). Chief Nuchia accepted this recommendation and referred Hayden's file to the Personnel Concerns Unit for review and evaluation on November 24, 1992. *See* Inter Office Correspondence, S. Nuchia to Personnel Concerns Unit, dated Nov. 24, 1992 (Exhibit B to City's Motion). Hayden was notified and an employee notification meeting took place on January 27, 1993. *See* Houston Police Department, Personnel Concerns Program, Personnel Concerns Report ("Concerns Report"), at 25. During that meeting, Officer S.C. Kinzer explained to Hayden that due to his extensive complaint and disciplinary history, the Administrative Disciplinary Committee had made a recommendation that he be evaluated by the Personnel Concerns Committee. The Committee would review his employment history and then make a recommendation regarding possible placement in the Personnel Concerns Program. *See id.*

During the referral to HPD's Personnel Concerns Committee, the Internal Affairs Division received a complaint from Keith Donaldson, a detainee, that Hayden had questioned him repeatedly about his penis, and had requested that Donaldson expose himself to Hayden while being transported to jail. *See* Statement of Keith Lewis Donaldson (Exhibit B to City's Motion). An investigation ensued. Donaldson's allegation was classified as "not sustained," meaning that there was insufficient evidence to either prove or disprove the allegation. *See* Letter, R.W. Holland to R. Hayden, dated Aug. 9, 1993 (Exhibit E to City's Motion). The investigation did conclude, however, that Hayden acted improperly in allowing Donaldson to ride in the front seat of the patrol car, and Hayden therefore received a one-day temporary suspension on June 30, 1993. *See* Inter Office Correspondence, S. Nuchia to Fire Fighters' and Police Officers' Civil Service Commission of the City of Houston, dated June 30, 1993 (Exhibit E to City's Motion).

The Personnel Concerns Committee met on March 15, 1993 to evaluate Hayden's case study and urged that Hayden be placed in the Personnel Concerns Program. *See* Inter Office Correspondence, J.L. Dotson to S. Nuchia, dated March 17, 1993 (Exhibit B to City's Motion). The Concerns Report revealed that Hayden had received 31 complaints, and that many of Hayden's supervisors seriously questioned Hayden's fitness as an officer. *See generally,* Concerns Report. The Committee was "especially concerned with a current pending complaint alleging possible sexual misconduct by Officer Hayden." Inter Office Correspondence, J.L. Dotson to S. Nuchia, dated March 17, 1993. The Committee urged that Hayden be placed in the Personnel Concerns Program. *See id.* Chief Nuchia concurred with the recommendation, and placed Hayden in the program on March 24, 1993. *See* Inter Office Correspondence, S. Nuchia to R. Hayden, dated March 24, 1993 (Exhibit B to City's Motion).

During the same Committee meeting of March 1993, the Committee also determined that Hayden's case should be presented to the Administrative Personnel Committee, because Dr. G. Riede ("Riede") of HPD Psychological Services concluded after an interview with Hayden that, based on Hayden's complaint history of inappropriate conduct and behavior, there was a potential liability issue if Hayden were to remain on patrol. *See* Inter Office Correspondence, J.L. Dotson to S. Nuchia, dated April 1, 1993 (Exhibit B to City's Motion). D.L. Slate ("Slate"), Hayden's Supervisor, also recommended that Hayden be referred to the Administrative Personnel Committee for a psychological evaluation. *See* Affidavit of D.L. Slate (Exhibit F to City's Motion) ("Slate Affidavit"), at 2. Slate based his recommendation on various concerns, including his recent discovery that Hayden was under the care of a psychiatrist and taking prescription medication, as well as the Donaldson complaint. *See id.*

Pursuant to these requests, the Administrative Personnel Committee arranged for Hayden's psychological testing and evaluation. *See* Inter Office Correspondence, C.O. Bradford to M.W. Thaler, dated June 12,

1993 (Exhibit C to City's Motion). On or about July 7, 1993, Hayden was removed from his regular patrol duties and assigned to the Radio Room of the Northeast Patrol Division. *See* Slate Affidavit, at 2. On August 27, 1993, a psychological evaluation of Plaintiff was issued by examining psychologist Michael D. Cox, Ph.D. Based on the evaluation, Dr. Cox concluded that "Officer Hayden does not appear to represent any risk to himself or to the community.... I strongly recommend that Officer Hayden continue his current therapeutic regimen to include more sensitization to how his behavior and appearance effect (*sic*) those he works with. As I understand it, Officer Hayden has been referred to the HPD Personnel Concerns Program and I support this assignment."[2] *See* Psychological Consultation, dated Aug. 27, 1993 (Exhibit C to City's Motion). It is unclear whether Dr. Cox was aware of the prior sexual misconduct complaint, or that Hayden was currently not on patrol duty.

"Based on Officer Hayden's evaluation, a personal interview and discussions with his supervisors," the Administrative Personnel Committee recommended to Chief Nuchia, *inter alia*, that Hayden be returned to normal patrol duties immediately. Inter Office Correspondence, C.O. Bradford to S. Nuchia, dated Sept. 14, 1993 (Exhibit C to City's Motion). Therefore, on October 1, 1993, Chief Nuchia informed Hayden that: he must continue in the Personnel Concerns Program to complete a minimum of one year; he must continue counseling sessions until a full release was received; he would be allowed to return to patrol duties immediately; and after completion of one year in the Personnel Concerns Program, he would be allowed to transfer to another station.[3] *See* Inter Office Correspondence, S. Nuchia to R. Hayden, dated Oct. 1, 1993 (Exhibit Exhibit C to City's Motion).

Several months later, the alleged sexual assault on Plaintiff Centamore occurred.

After an investigation of the Centamore incident, Chief Nuchia suspended Hayden indefinitely from his classified position at HPD based on Plaintiff's allegations and Hayden's refusal to address them when ordered to do so. *See* Inter Office Correspondence, S. Nuchia to Firefighters' and Police Officers' Civil Service Commission of the City of Houston, dated June 8, 1994.

Plaintiff originally brought this action in state court against the City, the HPD, and Hayden. Defendant removed the action to federal court on February 23, 1996. *See* Notice of Removal [Doc. # 1]. Plaintiff asserts liability on the part of the City under 42 U.S.C. § 1983 (1994) for violating his civil rights under color of state law, and for negligence under Texas law.

## II. *SUMMARY JUDGMENT STANDARD*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th

---

**2.** Dr. Cox cited the "reason for consultation" thus:

> A psychological consultation was requested to assess this officer's current mental status with regard to concern that he may be exhibiting psychotic behavior as well as signs of deepening depression. There is additional concern over this officer's apparent pattern of excessive time off, excessive complaints generated against him and a tendency to over-react to instances of citizen defiance against him. Officer Hayden is currently involved in individual psychotherapy and taking medication for depression prescribed by a psychiatrist.

*See* Psychological Consultation, at 1.

**3.** Officer Slate testified that up to the time that Plaintiff complained to the Internal Affairs Division, Hayden continued to be monitored closely by the Personnel Concerns Unit and Slate himself. *See* Slate Affidavit, at 2–3. Slate apparently monitored Hayden's radio broadcasts, having Hayden's mobile data terminal transmissions monitored, and rode with Hayden during his patrol duties for 4–5 hours. Additionally, Slate would check out a "cool car"—an unmarked police car—and follow Hayden, often appearing at Hayden's calls for service. Slate also conversed with individuals who interacted with Hayden and observed the interactions. *See id* at 3.

Cir.1994) (en banc); *Boze v. Branstetter,* 912 F.2d 801, 804 (5th Cir.1990). The facts are to be reviewed with all inferences drawn in favor of the party opposing the motion. *See Boze,* 912 F.2d at 804 (citing *Reid v. State Farm Mut. Auto. Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986)). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (5th Cir.1995).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. For any matter on which the nonmovant carries the burden of proof at trial, however, the movant may, by merely pointing to the absence of evidence supporting the essential elements of the nonmovant's case, shift to the nonmovant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact so as to warrant a trial. *See Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718–19 (5th Cir.1995); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

The nonmovant's burden on summary judgment may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *See Douglass v. United Servs. Auto. Ass'n,* 65 F.3d 452, 459 (5th Cir.1995), *revised on other grounds,* 79 F.3d 1415 (5th Cir.1996) (en banc); *Little,* 37 F.3d at 1075. In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *See McCallum Highlands,* 66 F.3d at 92; *Little,* 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *See Little,* 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).

## III. DISCUSSION

### A. Section 1983 Liability

 *Legal Standards.*—Section 1983 imposes liability upon any person who deprives another of "any rights, privileges, or immunities secured by the Constitution and laws" while acting "under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory or the District of Columbia." 42 U .S.C. § 1983 (1994). Courts consider municipalities and other local governmental bodies "persons" within the meaning of § 1983. *See Board of County Comm'rs v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1387, 137 L.Ed.2d 626 (1997); *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 689, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Meadowbriar Home for Children, Inc. v. Gunn,* 81 F.3d 521, 532 (5th Cir.1996). A municipality, however, may not be held liable under § 1983 "solely because it employs a tortfeasor." *Board of County Comm'rs,* 117 S.Ct. at 1388. It is well established that municipalities do not incur § 1983 liability under the theory of *respondeat superior. See id.; Pembaur v. City of Cincinnati,* 475 U.S. 469, 478–79, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Oklahoma City v. Tuttle,* 471 U.S. 808, 818, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion). Instead, in order to impose liability upon a municipality under § 1983, the plaintiff must identify a municipal "policy" or "custom" that caused the plaintiff's injury. *See Board of County Comm'rs,* 117 S.Ct. at 1388; *Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Pembaur,* 475 U.S. at 480–81, 106 S.Ct. 1292; *Monell,* 436 U.S. at 693, 98 S.Ct. 2018; *Meadowbriar,* 81 F.3d at 533 ("If a § 1983 suit is brought against a city, the claim must be based upon the implementation or execution of a policy or custom which was officially adopted by that body's officers.") (citations omitted).

 In order to prove liability on the part of a municipality, the plaintiff must dem-

onstrate that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Board of County Comm'rs*, 117 S.Ct. at 1388. In other words, "a plaintiff must show that a municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

The Supreme Court has recently clarified the distinction between "those § 1983 cases that present no difficult questions of fault and causation and those that do." *Board of County Comm'rs*, 117 S.Ct. at 1389. In *Board of County Comm'rs v. Brown*, the Court recognized that "[c]laims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof."[4] *Id.* The Court reiterated that "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Id.* at 1390 (citations omitted).[5] "Deliberate indifference," according to the Court, "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known

or obvious consequence of his action." *Id.* at 1391; *Scott v. Moore*, 114 F.3d 51, 55 n. 4 (5th Cir.1997).

■■ In the context of inadequate screening, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Board of County Comm'rs*, 117 S.Ct. at 1392. Thus, a finding of culpability on the part of a municipality based on a failure to perform adequate screening cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury; rather, it must depend on a finding that the particular employee in question was highly likely to inflict the particular injury suffered by the plaintiff, and the connection between the background of the particular officer and the specific constitutional violation must be strong. *See id.* at 1392.

■■ In the Fifth Circuit, a plaintiff seeking to establish a § 1983 claim based on an official policy or custom must plead facts showing that (1) a policy or custom existed, (2) the governmental policymakers actually or constructively knew of its existence, (3) a constitutional violation occurred, and (4) the custom or policy served as the moving force behind the violation.[6] *See Meadowbriar*, 81 F.3d at 533.

---

4. The Court noted that where a claim of municipal liability rests on a single decision that does not itself represent a violation of federal law and does not direct such a violation, "the danger that a municipality will be held liable without fault is high." This is so because

> there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate. Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action, rather than some other intervening cause.

*Id.*

5. The Court continued:

> Existence of a "program" makes proof of fault and causation at least possible in an inadequate training case. If a program does not prevent constitutional violations, municipal de-

cisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.... In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the "moving force" behind the plaintiff's injury.

*Board of County Comm'rs*, 117 S.Ct. at 1390.

6. Put another way, in order to show that a policy of hiring or training caused the alleged injury, the plaintiff must prove that (1) the training or hiring procedures of the municipality's policymaker were inadequate, (2) the municipality's policymaker was deliberately indifferent in

*Analysis.*—Defendant argues that Plaintiff can adduce no competent evidence probative of a municipal policy of deliberate indifference to the rights of citizens. The Court is not persuaded on the record presented. Fact questions exist regarding whether the City's actions concerning Hayden were taken with deliberate indifference as to their known or obvious consequences, and whether they were the moving force behind the sexual assault.

Specifically, Plaintiff has set forth evidence establishing genuine fact questions concerning whether there was deliberate indifference in the City's decision to put Plaintiff back on patrol, and the method and length of time of monitoring his activities in reliance on Dr. Cox's psychological evaluation of Hayden. First, as Plaintiff points out, Cox's evaluation does not reveal whether Cox was completely apprised of Hayden's disciplinary background—most importantly, whether the doctor was aware of the prior complaint of sexual misconduct. *See supra* note 2. There are questions as to whether there was justifiable reason to return Plaintiff to patrol assignment. Cox's evaluation was at best cautious and ambiguous. The City's rationale for reliance on such report is likewise unclear.

Second, when Dr. Cox recommended that Hayden "continue his current therapeutic regimen" and commended his referral to the HPD Personnel Concerns Program, Hayden was working in the radio room and was not on patrol. There is no evidence in the record indicating that Dr. Cox released or approved Hayden for return to patrol duties.

Additionally, the evidence submitted in the Concerns Report establishes that Hayden's employment history was marred by numerous complaints and behavioral concerns raising questions about Hayden's fitness as an officer. Moreover, Hayden's supervisors exhibited considerable concern about Hayden. *See, e.g.,* Concerns Report, at 17 ("Hayden does not belong on the police force and should have been fired long ago."). He continued to be on medication for depression or other medical problems, and psychoanalysis.

Plaintiff thus has demonstrated the existence of genuine issues of material fact concerning whether returning Hayden to patrol duties, in light of his history while he was still participating in the Personnel Concerns Program, and based on an ambiguous and possibly uninformed psychological evaluation, constituted deliberate indifference and was a moving force behind the assault.

## B. *Waiver of Immunity Under Texas Tort Claims Act*

■■■■ *Legal Standards.*—In Texas, municipalities remain immune from tort actions unless a plaintiff can establish an exception to governmental immunity under the Texas Tort Claims Act. *See Washington v. City of Houston,* 874 S.W.2d 791, 795 (Tex. App.—Texarkana 1994, no writ).

TEX. CIV. PRAC. & REM. CODE ANN. § 101.021 (Vernon 1986 & Supp.1997) provides:

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

adopting the hiring or training policy, and (3) the inadequate hiring or training policy directly caused the plaintiff's injury. *See Baker v. Putnal,* 75 F.3d 190, 200 (5th Cir.1996); *Benavides v. County of Wilson,* 955 F.2d 968, 972 (5th Cir. 1992). Where the alleged policy is one of inadequate police training, the plaintiff can only satisfy the first element of municipal liability if the failure to train satisfies the "deliberate indifference" standard that applies to supervisor liability. *Benavides,* 955 F.2d at 972.

In the context of pretrial detainee cases, to succeed in holding a municipality accountable for an act or omission of an individual official, the plaintiff must show that the municipal employee violated the detainee's clearly established constitutional rights with subjective deliberate indifference and that the violation resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference. *See Flores v. County of Hardeman,* 124 F.3d 736, 737 (5th Cir.1997).

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant.

Further, TEX. CIV. PRAC. & REM. CODE ANN. § 101.057 states:

This chapter does not apply to a claim:

\*　　\*　　\*　　\*　　\*　　\*

(2) arising out of assault, battery, false imprisonment, or any other intentional tort, including a tort involving disciplinary action by school authorities.

*Analysis.*—Defendant asserts that Plaintiff fails to state a claim for negligence or gross negligence under the limited waiver of immunity provisions of the Texas Tort Claims Act. Defendant argues that Plaintiff's chief complaint emanates from the hiring, retention, and supervision of Hayden, and that none of those claims involve misuse of tangible personalty. Moreover, Defendant contends that the assault was an intentional tort. Defendant misconstrues Plaintiff's negligence claim. Plaintiff has raised fact questions regarding this cause of action.

Plaintiff does not base his claim on the sexual assault committed by Hayden—clearly an intentional tort. Rather, Plaintiff submits that "the City's conduct in entrusting tangible property [such as the badge, uniform, gun, radio, computer, or car] combined with inadequate supervision of Hayden's use of such property was negligent and, in fact, grossly negligent." *See* Plaintiff's Response, at 23–24. Plaintiff maintains that Defendant's negligent use of the tangible property created an opportunity, means, and private location for Hayden's assault on Plaintiff.

 The fact that an intentional tort occurred is not dispositive. "Intentional conduct intervening between a negligent act and the result does not always vitiate liability for the negligence." *Delaney v. University of*

*Houston,* 835 S.W.2d 56, 60 (Tex.1992) (negligence action by rape victim against public university did not fall within intentional tort exception to waiver of immunity under Texas Tort Claims act where claim against university for allegedly failing to repair dormitory lock was distinct from rape she suffered); *accord Rideau v. Jefferson County,* 899 F.Supp. 298, 304–305 (E.D.Tex.1995) (if negligence is distinct from intentional act ultimately causing harm, it is cognizable cause of action against an otherwise immune governmental unit). For the purposes of the Act, Plaintiff's claim is not one "arising out of" an intentional tort, because the claim arises instead out of the City's alleged negligence assigning Hayden to a patrol, providing him with a car and no partner or adequate supervision of his use of that equipment, all of which enabled Hayden to commit offending acts. *See Delaney,* 835 S.W.2d at 59.

The factual and other deficiencies alleged by Defendant concerning this claim do not entitle Defendant to summary judgment, since these arguments are premised on a misconstruction of Plaintiff's claim. Whether Plaintiff will meet his burden of proof factually is a different issue—one for the jury. In sum, therefore, Plaintiff has established the existence of fact issues regarding the City's negligence.

## IV. CONCLUSION

The Court determines that fact questions exist regarding Plaintiff's § 1983 and state law claims against the City,[7] and that summary judgment is therefore not warranted. It is therefore

**ORDERED** that the City's Motion for Summary Judgment [Doc. # 39] is **DENIED.**

---

7. The record leaves additional question unanswered, including:
 1. What specifically caused the Donaldson complaint to be "not sustained"?
 2. Why specifically was Hayden placed back on patrol? Was he requesting such placement? Was this typical?
 3. Was part of the impetus for returning Hayden to patrol duties based upon his undesirability as perceived by certain HPD departments?